STATE OF MAINE                          BUSINESS AND CONSUMER COURT
CUMBERLAND, ss.                         DOCKET NO. BCD-RE-2019-00009


KINDERHAUS NORTH LLC,                   )
PRIME PROPERTIES ME LLC,                )
KAREN and BRIAN FULLERTON,              )
                                        )
                                        )
            Plaintiffs/                 )
            Counterclaim Defendants,    )
                                        )
                                        )
v.                                      )
                                        )
KARL and STEPHANIE R. NICOLAS,          )
                                        )
            Defendants/                 )
            Counterclaim Plaintiffs.    )
                                        )
———————————————————                     )    Corrected JUDGMENT
                                        )    FOLLOWING BENCH TRIAL
KINDERHAUS NORTH LLC,                   )
PRIME PROPERTIES ME LLC,                )
KAREN and BRIAN FULLERTON,              )
                                        )
            Third-Party Plaintiffs,     )
                                        )
v.                                      )
                                        )
H. ALLEN RYAN and DIANNE E.             )
RYAN,                                   )
            Third-Party Defendants.     )
                                        )


        This case involves a dispute over the scope of a right of way, timber trespass, and common

law trespass, all involving properties on Bailey Island in Harpswell, Maine. The case was tried to

the Bench on August 30 & 31, 2021.[1] The parties submitted post-trial briefs in lieu of closing

---

[1] Karen Fullerton, Plaintiff/Counterclaim Defendant; Brian Johnson, professional land surveyor; and Thomas Emery, landscape architect, testified on behalf of the Plaintiffs/Counterclaim Defendants. Karl and Stephanie Nicolas, Defendants/Counterclaim Plaintiffs; Jacob Pierson, owner and operator of a tree nursery; Roxanne York, real estate agent in Harpswell; and Susan Allen Favreau, the previous owner of one of the properties involved, testified on behalf of Defendants/Counterclaim Plaintiffs. The Third-Party Defendants, Allen and Dianne Ryan, did not participate in the trial or in the litigation generally.

1

arguments on November 5, 2021. The parties submitted post-trial reply briefs on November 19, 2021. On November 23, 2021, 2021, Karl and Stephanie Nicolas filed a Motion to Strike, to Seal & Impound, and for Sanctions, all directed at Plaintiffs' post-trial briefing. The Motion to Strike was not fully briefed until December 21, 2021. Consequently, although the trial occurred in August 2021, this case was not fully briefed and ready for consideration until December 21, 2021.

## FINDINGS OF FACT

The Court has carefully weighed the credibility of the parties and witnesses. Based on the Court's first-hand observations of the right of way during two site visits,[2] the parties' stipulations, and the evidence adduced at trial, and drawing all reasonable inferences therefrom, the Court makes the following findings of fact.[3]

### I.      Subdivision Conveyance History

The parties to this action are record fee owners of certain lots depicted on the Plan of Abner's Point Lots on Bailey Island, Harpswell, Maine for Bruce Allen dated August 1979 and recorded September 29, 1979 in the Cumberland County Registry of Deeds, Book of Plans, Volume 124, Page 60 ("the Plan"). At the time the Plan was created, the property was owned by Bruce and Joanne Allen (the "Allens").[4] The Plan subdivided the Allens' parcel into Lots 1-6 (hereinafter the "Abner's Point Subdivision or the Subdivision).[5] See Illustration No. 1. The Allens ultimately conveyed all of the lots and are thus the grantors in the analysis that follows.

---

[2] At the request of the parties, Judge Duddy conducted formal site visits on October 6, 2020, and June 30, 2021, accompanied by counsel and the parties who wished to be present.
[3] The findings of fact are made by a preponderance of the evidence, but the findings of fact necessary to support the award of punitive damages are made by clear and convincing evidence.
[4] The Plan was approved by the Town of Harpswell's Planning Board and recorded.
[5] The lots that are the subject to this dispute are Lots 1, 2, 4, 5, and 6. Lot 3 is not subject to this dispute, and it is therefore not discussed in this decision.

The subdivision conveyance history and deed language were previously described in detail in this Court's order on cross motions for summary judgment. *See Kinderhaus N. LLC, et al. v. Nicolas*, No. BCD-RE-19-09, 2020 Me. Bus. & Consumer LEXIS 13 (April 23, 2020). Those facts are incorporated herein but are not repeated, except in summary fashion.[6] In 1979, the Allens conveyed Lots 1, 2, and 3 to Allen and Carolyn Wilson (the "Wilsons"), and Lot 4 to Edward and Florence Schaub (the "Schaubs"). Lot 4 changed hands several times, and was eventually acquired by Neal and Susan Favreau in 2003. In 2006, the Wilsons conveyed Lots 1 and 2 to Allen and Dianne Ryan (the "Ryans"). Despite earlier conveying Lots 1, 2, 3, and 4, the Allens retained Lots 5 and 6 until 2016. The Allens thus continued to own a portion of the original property during most of the history of the subject right of way.

Karen Fullerton ("Fullerton") and her husband Brian Fullerton (together the "Fullertons") are residents of New Jersey. The Fullertons are the current owners of Lots 5 and 6. The Fullertons purchased their lots in 2016 from the Allens (and family trusts set up for the Allens). Both Lots 5 and 6 have waterfront on Mackerel Cove. Lot 6 contains a house which the Fullertons use as a second home. Lot 5 is undeveloped, although it contains a tennis court. The Fullertons hope to eventually build a house on Lot 5 for themselves. At the time the Fullertons purchased Lots 5 and 6, the driveway to the house on Lot 6 was paved, and Abner Point Road was paved all the way through Lots 5 and 6.

Prime Properties ME LLC ("Prime") and Kinderhaus North LLC ("Kinderhaus") are Maine limited liability companies. Karen Fullerton ("Fullerton") is a member of both Prime and Kinderhaus, and she is the Manager of both companies.[7] Prime is the current owner of Lot 1. Lot

---

[6] Further, the parties have stipulated to the chain-of-title for all the properties and have stipulated all the source deeds into evidence as Joint Trial Exhibits.

[7] The Fullertons, Prime, and Kinderhaus are sometimes referred to collectively herein as "Plaintiffs."

1 is undeveloped. It has waterfront on Merriconeag Sound. Kinderhaus currently owns Lot 2. Lot 2 is mostly undeveloped, but it does contain an open air, timber frame pavilion-style structure. On behalf of Kinderhaus, Fullerton may convert the structure on Lot 2 into a garage. Lot 2 does not have any waterfront. Prime and Kinderhaus purchased their respective lots in May 2018 from the Ryans. At the time Prime and Kinderhaus purchased Lots 1 & 2, Abner Point Road was paved to the beginning of Lot 2, and thereafter the road converted to a gravel surface. The driveway to Lot 4 was paved, and all the trees and the granite light post in the ROW were also already installed by predecessors-in-title to Lot 4.

Karl Nicolas and his wife Stephanie Nicolas are residents of Virginia. The Nicolases are the current owners of Lot 4 of the Abner's Point Subdivision. They first looked at the property in the summer of 2017 when it was for sale; they agreed to a purchase price in September 2017; and they closed on their purchase of the property in April 2018. They purchased Lot 4 from the Favreaus. Lot 4 has waterfront on Merriconeag Sound. The property contains a house which the Nicolases use as a second home, especially in the summers. They hope to retire to the property. At the time the Nicolases purchased Lot 4, the driveway to the property was paved. As discussed below, all the disputed trees and granite light post had been installed by the Nicolases' predecessors-in-title at or shortly after the original conveyance of the subject ROW. The Allens and all the lot owners at the time acquiesced, and none of the lot owners objected. The Nicolases have not placed any obstructions in the ROW.

The operative deeds in the chain of title for Lots 1, 2 and 4 specify that the lots shall only be used for "single family residential purposes," and that only one single family residential dwelling shall be permitted on each lot. The deeds prohibit Lots 1, 2 and 4 from being used for any trade, business, or commercial activity, and prevent the keeping or maintaining of livestock,

4

animals, or poultry on the lots other than as household pets. The operative deeds in the chain of title for Lots 1 and 2 also contain the following language:

> The above described Lot 1 and Lot 2 are conveyed with the benefit of a twenty (20) foot wide right of way for vehicular as well as foot traffic. Said right of way being located on the southwesterly boundary line of Lots 4 and 5 and to be used in common with the owners of Lot 4. For a more particular description of the Lots and rights of way, reference may be had to the aforesaid Plan of ABNER'S POINT.

The operative deeds in the chain of title for Lot 4 contain the following matching language:

> The above described Lot 4 is conveyed subject to a twenty (20) foot wide right of way for vehicular as well as foot traffic for the benefit of the owners of Lots 1 and 2 on said Plan of ABNER'S POINT. Said right of way being located on the southwesterly boundary of Lot 4. For a more particular description of the Lot and rights of way, reference may be had to the aforesaid Plan of ABNER'S POINT.

Based on this language, the Court previously determined that Prime (owner of Lot 1) and Kinderhaus (owner of Lot 2) have express deeded easement rights to a twenty-foot wide strip of land along the southwestern border of the Nicolases property (Lot 4) for "vehicular as well as foot traffic" (hereinafter the "ROW"). *Id.* at *11.[8] The purpose and scope of the ROW is the subject of this case.

The Abner's Point Subdivision extends the width of Bailey Island with waterfront on either side. On the northwestern border of the Subdivision lies Merriconeag Sound ("the Sound"). Mackerel Cove is to the southeast. The Plan is bisected east to west by Abner Point Road. Abner Point Road is a private road that existed at the time the subdivision was created, extending westward to adjacent properties and eastward to Route 24. It is the only means of driving on and off Abner Point and the deeds to all the lots provide the right to use Abner Point Road. Abner Point

---

[8] Based on other language in the relevant deeds, the Court also previously determined that the Fullertons (owners of Lots 5 and 6) have express deeded easement rights to a walking ROW over the same 20 ft wide strip of land for the purpose of providing walking access to Merriconeag Sound. *Id.* at *14.

Road runs through portions of Lots 2, 5, and 6. Lots 1 and 4 only connect to Abner Point Road via the ROW. At all relevant times, Abner Point Road has been paved through Lots 5 and 6 and several feet past the intersection of the ROW at Lot 2. Beyond that point the surface of Abner Point Road becomes gravel as it passes through the remainder of Lot 2.

## II.      The Right-of-Way

The ROW, as shown on the Plan, is twenty (20) foot wide, beginning in Lot 5 on the northwest side of Abner Point Road and running in a northwest direction to Merriconeag Sound along the southwestern border of Lots 5 and 4 (and adjacent to the southeastern boundary of Lots 2 and 1).[9] The ROW is depicted on the Plan as being undeveloped. As discussed below, except for the portion of the ROW paved as a driveway for Lot 4, the ROW is still undeveloped. The surface of the ROW is mostly grass. The portion of the ROW that runs through Lot 5 on the Plan is marked as being in a no building zone. The northwest terminus of the ROW in Lot 4 dead-ends at Merriconeag Sound and is in a shoreline zone. The shoreline at the terminus is undeveloped, rocky, steep, difficult to traverse, and vegetated by naturally occurring shrubs and grasses.

The ROW is flat until roughly twenty-five feet past the point where the boundary line between Lots 1 and 2 intersects with the ROW. The flat surface of the ROW ends right about where a large red pine tree is located (more on this tree later). Proceeding northwest towards Merriconeag Sound from the pine tree, the ROW begins to markedly slope downwards before flattening out somewhat in the shoreland zone near the ROW's terminus. After the red pine tree scattered outcrops of ledge begin protruding through the surface of the soil. Accordingly, proceeding in a northwesterly direction after the red pine tree, the ROW is not reasonably suitable

---

[9] The Plan also shows a right-of-way that starts on the southeastern side of Abner Point Road in Lot 5 and runs in the southeastern direction along Lot 5's southwestern border to Mackerel Cove. This right-of-way is not the subject of this dispute.

for residential vehicle traffic or for use as a residential driveway.[10] Apart from a contractor using a tracked vehicle on one occasion to drive down the slope and over the ledges, vehicles have never used the stretch of the ROW below the red pine tree. The Nicolases use that portion of the ROW to walk and for recreation. Allowing regular traffic to drive down the slope and over the ledges protruding through the surface would cause a safety hazard to people in the ROW.

There is good vehicle access to the southeasterly corner of Lot 1 from the ROW in the flat, grassy, space before the red pine tree. The topography and surface of the soil in that portion of the ROW pose no problems to vehicle traffic or use as a driveway. Vehicles accessing Lot 1 in that area would pose no safety hazards. For these reasons, the stretch of the ROW before the red pine tree is the natural place from which to provide vehicle access to Lot 1.

Lots 1 and 4 are not connected to Abner Point Road and must rely on the ROW to access the road. As mentioned above, Lot 4 is accessed by a paved driveway located slightly to the right of center of the ROW and that runs from Abner Point Road across Lot 5 and into the southern corner of Lot 4. The paved driveway through Lot 5 is 10 feet wide, although it is wider where it intersects with Abner Point Road in order to accommodate vehicles turning on and off the Road. The paved driveway extends across Lot 5 and enters Lot 4. No other portion of the ROW is paved or improved in any way. The driveway to Lot 4 was paved when the original grantors, the Allens, owned Lot 5. No objections were raised. All the lot owners at the time acquiesced.

In contrast to Lots 1 and 4, Lots 2 and 5 may be directly accessed from Abner Point Road. Lot 2 may also be accessed from the portion of the ROW running through Lots 5 and 4. Lots 2, 5 and 6 do not have waterfront on Merriconeag Sound, and so those lots must rely on the ROW to

---

[10] On one occasion the Nicolases hired a contractor to trim trees (not in the ROW) in front of their house and near the Sound. The contractor used a tracked vehicle to navigate past the pine tree down the slope and over the ledges of the ROW. The landscaper whom the Nicolases hire to mow the ROW on the slope uses a push mower, rather than a riding mower, because of the gradient and presence of ledge outcrops.

access the Sound's waterfront.[11] Of note, the Plan also depicts a ten (10) foot walking right of way in common at the top of Merriconeag Sound's bluff along Lot 1's northwestern waterfront border. This walking right of way is not in dispute. The walking way connects to the northern terminus of the ROW where it meets Merriconeag Sound. From Abner Point Road to the Sound, the ROW is suitable for walking throughout its length.

In 2003 or 2004, the previous owners of Lot 4, the Favreaus, installed a granite light post right-of-center in the ROW, 11 feet from the boundary of Lot 1, and just beyond the Lot 4 driveway. The owners of Lots 1 and 2 did not object, nor did the Allens, who still owned Lots 5 and 6. The granite light post has electricity running to it. There is room for vehicles and foot traffic to pass the light post on the left, by using the left-hand side of the ROW. Indeed, service and other vehicles have driven on the ROW to the left of the light post. The ROW is clear and unobstructed to the left of the light post, and the ROW surface shows that vehicles have used the left-hand side of the ROW in the vicinity of the light post. Landscapers have successfully parked to the left of the granite post in the ROW to service Lots 1 & 2. At the time the Nicolases purchased Lot 4, a large ocean dock was placed for storage during the off-season in the ROW to the left of the granite post. All that being said, the space available for vehicles passing to the left of the granite post is tight, and would not easily accommodate regular vehicle passage, especially with people walking in the ROW. The space to the left would also not reasonably accommodate maintenance activities associated with a driveway, such as snowplowing. In order to reasonably facilitate regular vehicle traffic on a driveway to be placed to the left of the granite post, the post would need to be moved at least three feet to the right.

---

[11] Of course, Lots 5 and 6 have waterfront directly on Mackerel Cove.

### III. Trees in the Right-of-Way

Prior to the chainsaw activity of Karen Fullerton, which will be described below, there were nine trees in the ROW. The first of the trees, proceeding in a northwesterly direction from the light post, was an ornamental juniper (Juniperus spp.) that had been planted long before the Nicolases purchased Lot 4. The juniper was approximately thirty years old and was planted approximately twenty-five years ago (just before, at or about the time the Allens created the Abner's Point Subdivision and the ROW). As discussed below, this is one of the four trees Fullerton cut.[12] The juniper was planted on the far-right side of the ROW. The main stem of the tree had a caliper diameter (which is measured just above the root collar) of nearly 10 inches, and the tree had an elegant, spreading canopy that on the left extended into ROW as far as the light post. The tree was in excellent health and thriving in its location. The juniper was part of a larger, well-established landscape area on Lot 4 to the right of the ROW. There was room for vehicles to pass the juniper on the left, by using the left-hand side of the ROW. To the extent more room was reasonably required, the juniper's canopy could have been carefully pruned back rather than destroyed. Fullerton had no legitimate reason to cut down the main stem of the juniper.

Proceeding northwesterly in the ROW toward Merriconeag Sound, the second tree was an ornamental native cherry tree (Prunus virginiana). This is another one of the four trees cut down by Fullerton. The tree was located left of the ROW's center, approximately thirty-five feet beyond the paved driveway, and about fifteen feet past the beginning of Lot 1. The tree was approximately fifteen to nineteen years old and was planted by the Favreaus in 2010 or 2011 as part of a landscaping project for Lot 4. The Allens still owned Lots 5 and 6, and there were no objections

---

[12] As discussed below, the Nicolases interrupted Fullerton before she could finish completely cutting down the tree, as was her intention. A small stem was left standing. Nevertheless, Fullerton substantially destroyed the tree.

to its planting from them or any of the lot owners at the time. At the time Fullerton cut it down, the tree had a caliper diameter of about 9 inches. Its canopy measured 15 feet in diameter, but would allow vehicle traffic beneath it. The tree was in excellent health, thriving in its location, and very attractive. There was room to curve a driveway into the southeasterly corner of Lot 1 without needing to cut down the tree. Fullerton had no legitimate reason to cut down the cherry tree.

About eight feet beyond where the ornamental cherry tree was growing is the large red pine tree. The tree is big, measuring 16 inches in diameter at breast height ("DBH"). The tree is handsome, standing approximately 40 feet high, with a crown diameter of approximately 16 feet. This is the tree that marks the point beyond which the ROW is not suitable for vehicle traffic or driveway construction, due the slope and presence of ledges. The pine tree does not interfere in any way with constructing a driveway into the southeasterly corner of Lot 1 from in the flat, grassy area of the ROW in front of the pine tree.

Approximately fifteen feet past the pine tree was a beautiful, ornamental weeping cherry tree (Prunus sub. pendula.). This is another one of the four trees cut down by Fullerton. The tree was approximately eighteen years old and was also planted by the Favreaus in 2010 or 2011 as part of a landscaping project for Lot 4. None of the lot owners objected to its planting. At the time Fullerton cut it down, the tree had a caliper diameter of about 6 inches. The tree had a crown diameter of approximately 12 feet. The tree was in excellent health, thriving in its location, and very attractive. The tree did not interfere in any way with constructing a driveway into the southeasterly corner of Lot 1 from in the flat, grassy area of the ROW in front of the pine tree. Fullerton had no legitimate reason to cut down the tree.

Approximately fifteen feet past the first weeping cherry was another beautiful, ornamental weeping cherry tree (Prunus sub. pendula). This is last of the four trees cut down by Fullerton.

Like its nearby twin, the tree was also approximately eighteen years old, and was also planted by the Favreaus in 2010 or 2011 as part of their landscaping project. Similarly, there were no objections to its planting. It had a caliper diameter of about 8 inches. The tree had a crown diameter of approximately 12 feet. The tree was in excellent health, thriving in its location, and very attractive. The tree did not interfere in any way with constructing a driveway into the southeasterly corner of Lot 1 from in the flat, grassy area of the ROW in front of the pine tree. Fullerton had no legitimate reason to cut down the tree.

Proceeding past the ornamental trees in the direction of Merriconeag Sound, four ornamental, medium size spruce trees (each approximately 6 inches DBH) were planted long ago in the center or left of center in the ROW. There were no objections to their planting. Each of the trees is in good health and thriving. None of the spruce trees individually or collectively interfere with walking along the ROW. The tree did not interfere in any way with constructing a driveway into the southeasterly corner of Lot 1.

Despite the trees and granite light post, the portion of the ROW before the pine tree is accessible by both foot and vehicle. Fullerton has walked the full length of the ROW, even at night with the aid of a flashlight

## IV.     Cutting Trees in the Right-of-Way and Trespass

The Fullertons, through Prime and Kinderhaus respectively, purchased Lots 1 and 2 in April 2018[13] with the intent of retaining Lot 2 and "flipping" Lot 1. On behalf of her own property, Fullerton intended to impose building restrictions on Lot 1 to preserve the views of Merriconeag Sound from Lot 5. To prepare Lot 1 for sale, increase its marketability, but also protect her views,

---

[13] The is the same month the Nicolases closed on Lot 4. The week before the closing, the Nicolases learned Lots 1 and 2 were available. The day after they closed on Lot 4, the Nicolases submitted an offer on Lots 1 and 2, but the offer was not accepted. As described above, the Fullertons, acting through their LLCs, purchased Lots 1 and 2.

Fullerton, planned to provide water to Lot 1 by having a well drilled just inside the boundary of Lot 1, but down near the terminus of the ROW at Merriconeag Sound.[14] In order to provide access for the well driller, and to serve as vehicle access for Lot 1, Fullerton planned to extend the existing driveway in the ROW, with a paved or gravel travel way centered within the ROW, all the way down the slope and ledges to or near Merriconeag Sound.[15] The driveway would enter Lot 1 from the ROW at some point down the slope and between the spruces, in the vicinity of the proposed well. In furtherance of her plan, Fullerton intended to remove all the trees in the ROW.

In May 2018, communicating with the Nicolases through a realtor, Fullerton announced her plan to construct a driveway in the ROW and remove the granite light post and all the trees. In response, the Nicolases obtained a legal opinion. Also communicating through a realtor, the Nicolases let Fullerton know that they did not consent to construction of a driveway in the ROW, or removal of the trees, but that they were willing to "figure out a solution" that would satisfy everyone's needs. Thereafter, both sides engaged lawyers to advocate for their respective positions.

Fullerton, however, pressed forward with her plans for Lot 1. On behalf of Prime, Fullerton hired a well driller and entered into a contract with a contractor to build the driveway. Fullerton scheduled the well driller for the week of July 9, 2018 and notified the Nicolases of her plan to remove the trees and granite light post. She also offered to allow the Nicolases to remove these fixtures themselves. In response, the Nicolases gave Fullerton a Title 32 M.R.S. § 3033 Notice

---

[14] The Court notes that the selected well location is likely not possible due to the desired site being too close to Lot 4's septic leach field. In selecting a location for the well, Fullerton merely estimated the location of Lot 4's leach field, she did not actually verify the location, distances, or feasibility of properly drilling the well in the chosen location.

[15] Apart from this general sense of where Fullerton wanted the driveway for Lot 1 to be built, she did not obtain any specific plan or sketch for the driveway, and she had no specific plan or sketch for where a house would or could be located on Lot 1. She did not have an actual plan for the driveway prepared. She did not investigate whether she could route the travel way around the trees. Fullerton thus undertook to cut all the trees in the ROW based merely on her general intentions, and without exploring any alternative to mitigate destroying all the trees.

12

informing the Fullerton that they were seeking to have the easement rights vacated. The Nicolases did not remove the trees or the granite light post.

Unwilling to wait for the attorneys to work out the legal issues, Fullerton purchased a chainsaw and took matters into her own hands, literally. On or about June 28, 2018, unbeknownst to the Nicolases, Fullerton drove onto the ROW and parked her SUV straddling the boundary between Lots 4 and 5. She took out her chainsaw, walked onto the Lot 4 portion of the ROW, and proceeded to cut down and remove the native cherry tree and the two weeping cherry trees leaving only stumps a few inches off the ground where the once thriving trees stood.[16] Fullerton started with cutting these trees, because she viewed them as comparatively manageable, and she wanted to gain experience with the chainsaw before she felled the larger trees in the ROW. Fullerton is not an arborist or a forester, and had no experience operating a chainsaw or felling trees. She did not consult with an arborist or forester about felling or relocating and transplanting the trees.

The next day, June 29, 2018, Fullerton returned to the ROW to resume her chainsaw work. She cut down the main stem of the juniper bush, which included the portion of canopy that was growing into the ROW. She did not consult an arborist about how, whether or where to make pruning cuts, or how much of the tree to remove. She intended to remove all of the tree. However, while Fullerton was cutting the juniper with her chainsaw, the Nicolases arrived at their property and discovered her in the act. It was between 4:00 p.m. and 6:00 p.m. in the afternoon, and the Nicolases had just arrived after a long drive from Virginia. Because Fullerton was interrupted, she did not have time to cut down the entire tree. The tree was mostly destroyed, although a small stem of juniper was left standing, leaving the tree unbalanced and lopsided.

---

[16] Fullerton used a contractor to haul the debris away.

In cutting down the trees, Fullerton was acting on behalf of Prime, as an agent of Prime, and on her own behalf. She wanted to ensure Lot 1 was developed in a manner calculated to preserve the views from her Lot 5.

The Nicolases were stunned to discover Fullerton operating a chainsaw on their property. This was the first time Karl Nicolas had met Fullerton, but he knew who she was because of the New Jersey license plate on her vehicle. Fullerton's vehicle was partly blocking the Nicolases' driveway. Apart from gloves, Fullerton was not wearing safety equipment such as a hardhat, safety glasses, chainsaw chaps, or steel toed boots.[17] Karl asked Fullerton "why are you doing this, we're trying to work it out." Fullerton responded in a very hostile manner. She yelled at the Nicolases and called Karl an "idiot." She also made snide comments, saying to the Nicolases "you can thank me" for cleaning up the debris. She was very agitated throughout the incident. The Nicolases asked Fullerton to leave, which she did after placing her chainsaw in the back of her vehicle. The Nicolases were very disturbed by the incident, and even felt compelled to call the police.[18]

This was not the first time Fullerton had entered onto the Nicolases property without their permission. In April 2018, the Nicolases' security cameras recorded Fullerton entering onto the Nicolases' property, and walking around their pool, house, and dock.[19] The Nicolases were not present at the time, and Fullerton had no legitimate reason for entering onto and walking around their property. Because she had no reason to be there, Fullerton was acting on her own behalf, not on behalf of Prime or Kinderhaus. Nor is Fullerton the only member of her family to invade the Nicolases property without permission. The Nicolases security cameras also recorded Fullerton's adult son hanging out at the Nicolases' pool, smoking a cigarette.

---

[17] Fullerton was wearing a short-sleeved T-shirt, jeans, and running shoes.
[18] Apart from talking with Fullerton, the police took no action, and no charges were filed.
[19] The security video was not played at trial, but the testimony was undisputed.

In July 2018, when Fullerton cut down the Nicolases' trees, all four trees were alive and thriving. Fullerton did not have the Nicolases' permission to cut down the trees. Without waiting for the attorneys to work through the legal issues, Fullerton intentionally and knowingly cut down the trees. All of the trees were ornamental trees. The cost to replace the trees Fullerton cut down with trees of comparable size and the same or equivalent species are as follows:[20] Juniper - $650.00; 9-inch Prunus virginiana (the native cherry) - $10,000.00; 6-inch Prunus sub pendula (weeping cherry)- $6,700.00; and 8-inch Prunus sub pendula (weeping cherry) - $10,000.00. Transporting the trees, in two loads to ensure tree viability, would cost $10,000.00 in total or $2,500.00 per tree. The labor and machinery required to unload and plant the four trees would cost $8,250.00 in total or $2,062.50 per tree. In total, to replace, replant, and restore all four trees with trees of comparable size and the same or equivalent species would be $45,600.[21]

## CONCLUSIONS OF LAW

The legal issues to be decided in this case have to do with the scope of the ROW, on the one hand, and trespass on the other hand. Determining the scope of the easement is a necessary predicate to deciding the trespass issues. Thus, the scope question will be taken up first, followed by a discussion of timber and common law trespass.

**I.      Scope of the ROW**

---

[20] The Court credits and is persuaded by the expert reports and testimony offered by the Nicolases regarding the trees, including replacement and related costs. The Court was unpersuaded by the testimony of the expert called by the Fullertons.

[21] These costs reflect prices as of 2020. In 2019, the total replacement costs were $41,050.00, composed as follows: Juniper - $550.00; 9-inch Prunus virginiana (native cherry) - $9,000.00; 6-inch Prunus sub pendula (weeping cherry)- $6,000.00; and 8-inch Prunus sub pendula (weeping cherry) - $9,000.00. Transporting the trees, in two loads to ensure tree viability, would cost $9,000.00 in total or $2,250.00 per tree. The labor and machinery required to unload and plant the four trees would cost $7,500.00 in total or $1,875.00 per tree. The increase between 2019 and 2020 represents inflation, caused in part by the pandemic.

Plaintiffs seek a declaratory judgment that they have the right to cut down all the trees in the ROW and construct a lengthy driveway with a gravel or pavement surface, down the center of the ROW all or a significant distance through Lot 4, to provide access to Lot 1. The Nicolases seek a declaration that Plaintiffs may not disturb the soil of the ROW for a driveway of any length, or cut down the trees, because Lot 1 may be accessed by foot and by vehicle through the ROW in its present condition, trees and all. As discussed below, the language of the operative deeds, the intention of the parties to the original conveyance, and the conditions of the ROW on the ground before and after the ROW was created, determine the scope of the ROW and the contours of the resulting declaratory judgment.

a. **Ambiguity in the Deed's Language**

"Whenever an easement[22] exists by grant, it may be enjoyed to the extent of the legitimate meaning of the terms used, but to that it must be confined." *Chandler v. Goodridge*, 23 Me. 78, 84 (1843). The scope of an interest in land conveyed by a deed is properly to be determined solely from the language of the conveyance, provided that the language is clear and unambiguous. *Badger v. Hill*, 404 A.2d 222, 225 (Me. 1979); *see also Sleeper v. Loring*, 2013 ME 112, ¶ 18, 83 A.3d 769 ("[a]s with any other portion of a deed, the scope of a party's easement rights must be determined from the unambiguous language on the face of the deed.")(citation and internal quotation marks omitted). Deeds that plainly describe the width, mode of passage through, and the termination point of a right-of-way may be unambiguous in those regards, but ambiguous in other

---

[22] "A right of way is an easement" *S. E. & H. L. Shepherd Co. v. Shibles*, 100 Me. 314, 318, 61 A. 700, 702 (1905). In Maine, "easement or right-of-way" generally means the right of a person to pass over the land of another person. *See Fissmer v. Smith*, 2019 ME 130, ¶ 45, 214 A.3d 1054 (quoting Easement, Black's Law Dictionary (10th ed. 2014) "An interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose (such as to cross it for access to a public road)."); *Sleeper v. Loring*, 2013 ME 112, ¶ 18 n.5, 83 A.3d 769 (A right-of-way is legally defined as a legal right to pass through property owned by another. See BLACK'S LAW DICTIONARY 1326 (7th ed. 1999)); *see also* 33 M.R.S. § 458, Easements or rights-of-way; installation of utility services; 33 M.R.S.A. § 459, Easements and rights-of-way; installation of docks.

16

critical respects, such as scope. *Badger,* 404 A.2d at 225 (finding a deed that plainly described the width of the right of way, the mode of passage, and the terminus to be unambiguous in respect to basic elements, but ambiguous in respect to the full scope of the use or purpose.) When a deed is silent as to the purpose of a right of way, "the deed may be unambiguous so far as it goes, but it does not go far enough in respects that are critical to the evaluation of the full scope, contemplated by the parties, of the use to be made of the right of way." *Id.*; *see also Flaherty v. Muther,* 2011 ME 32, ¶ 56, 17 A.3d 640.

Here, the location, length, and width of the ROW is clearly defined in the deeds and depicted on the Plan. Based on the language of the deeds, the court previously determined Lots 1 and 2 have express, deeded easement rights in the ROW for "vehicular as well as foot traffic."[23] The deed language, however, is silent as to the purpose and scope of the ROW regarding vehicles, and the Court did not previously address these issues. The deed language does not, for example, address whether the dominant estate can disturb the soil of the ROW in order to construct a driveway, whether the surface can be graveled or paved, where a driveway can be located within the ROW, whether a driveway can extend the entire length and width of the ROW across Lot 4, and related questions. Accordingly, as to vehicle use, the purpose and scope of the deed language is ambiguous.

When the purpose of an express easement is not clear, the court must "ascertain the objectively manifested intention of the parties to the original conveyance in light of circumstances in existence recently prior to the execution of the conveyance, as well as use of the easement and acts acquiesced to during the years shortly after the original grant." *Flaherty v. Muther,* 2011 ME 32, ¶ 55, 17 A.3d 640; *see also Sleeper v. Loring,* 2013 ME 112, ¶ 20, 83 A.3d 769. A court may

---

[23] And Lots 5 and 6 have foot traffic rights over the ROW.

17

consider evidence of extrinsic circumstances as an aid to determine the parties' intent and the scope of the easement rights. *Fine Line v. Blake*, 677 A.2d 1061, 1064 (Me. 1996) (citing *N. Utils., Inc. v. S. Portland*, 536 A.2d 1116, 1117 (Me. 1988)); *Badger*, 404 A.2d at 225 (citing *Gillespie v. Worcester, Me.*, 322 A.2d 93, 95 (1974)).

### b. Guiding Principles

The scope of a grantee's rights to use an easement is not limitless and the full scope of the use to be made of the right of way requires evaluation of the purpose it was intended to serve at the time of conveyance. *See Fissmer v. Smith,* 2019 ME 130, ¶ 45, 214 A.3d 1054 (finding the scope of easement rights for passage along recorded planned roads in a subdivision did not include the right to build driveways or other such similar activities normally associated with land ownership in the easement because such uses were outside the intended limited purpose of mere passage over the land); *Badger v. Hill*, 404 A.2d 222, 225 (Me. 1979); *Guild v. Hinman*, 1997 1997 ME 120, ¶¶ 7-8, 695 A.2d 1190 ; *Fine Line, Inc. v. Blake*, 677 A.2d 1061, 1064-65 (Me. 1996) (holding that even a ROW 'for all purposes' does not automatically include the right to install utility lines and remanding the case so that the trial court may determine the original parties' intended purpose for the ROW.); *see also Kaler v. Beaman,* 49 Me. 207 (1860) (since deed granted the free and unobstructed use of the easement for the limited purpose of allowing grantee passage to his mill from the highway, all other activities, like storing lumber on the easement, were outside the scope); *Alderette v. Grant*, Re-14-83, 2018 Me. Super. LEXIS 57 (April 20, 2018) (use of the easement was limited because it was not intended to be used as a road or storage).

A dominant estate owner may not use an easement to access property, or portions of a property, that the parties to the conveyance did not originally contemplate would be served by the easement. *See Flaherty v. Muther*, 2011 ME 32, ¶ 74, 17 A.3d 640. When determining the scope

18

of an easement, with its purpose in mind, the question is whether a particular use would have been within the contemplation of the parties to the original conveyance or reasonably foreseeable at the time of the grant. *Wardwell v. Duggins*, 2016 ME 55, ¶ 12, 136 A.3d 703 (citing to *Guild*, 1997 ME 120, ¶¶ 7-8, 695 A.2d 1190 and *Pettee v. Young*, 2001 ME 156, ¶ 15, 783 A.2d 637); *Badger v. Hill*, 404 A.2d 222, 226 (Me. 1979) (finding the purpose of an easement to a river included the right to build a dock because a dock was contemplated at the time of conveyance). Extrinsic evidence, such as "circumstances in existence recently prior to the execution of the conveyance, as well as use of the easement and acts acquiesced to during the years shortly after the original grant" may be considered when assessing if a particular use was reasonably foreseeable. *Wardwell v. Duggins*, 2016 ME 55, ¶ 12, 136 A.3d 703 (quoting *Sleeper v. Loring*, 2013 ME 112, ¶ 20, 83 A.3d 769); *see Badger,* 404 A.2d 222, 226 (finding testimonial evidence that original grantor and grantees toured the planned easement to determine where it ended in case the grantees wished to build a dock in the future was sufficient for a finding that a dock was within the scope of the easement). The original site plan showing rights-of-way may be used as evidence of the parties' intent. *See Rancourt v. Town of Glenburn*, 635 A.2d 964, 965 (Me. 1993).

Generally, "where the metes and bounds of an easement are explicitly described in the deed, the easement holder has the right to use the full extent of the described land for purposes consistent with the deeded easement." *Mill Pond Condo. Ass'n v. Manalio*, 2006 ME 135, ¶ 7, 910 A.2d 392. "If a grant expressly details its specific boundaries . . . the owner of the right of way is entitled to use the entire granted area, and is not limited to what is necessary or convenient." *Stanton v. Strong*, 2012 ME 48, ¶ 10, 40 A.3d 1013 (quoting *Mill Pond Condo. Ass'n v. Manalio*, 2006 ME 135, ¶ 6, 910 A.2d 392) (internal quotations omitted). Further, "where the grant of an easement is clearly for the purpose of allowing free and convenient passage over a lot from every

19

feasible point necessary for enjoyment of the easement, restriction of access to a particular point is impermissible." *Mill Pond Condo. Ass'n*, 2006 ME 135, ¶ 6, 910 A.2d 392. (citing *Cleaves v. Braman*, 103 Me. 154, 161, 68 A. 857, 860 (1907)) (emphasis added).

Despite these general rules, a grantee's use of the easement is nevertheless limited to a reasonable use within the scope of their rights. *Guild v. Hinman*, 1997 ME 120, ¶ 6, 695 A.2d 1190 (holding the reasonable use of a right-of-way is not limitless and is guided by the scope); *see Kaler,* 49 Me. at 208-09 (when exercising their rights, grantees may not unnecessarily, by wantonness or negligence, injure the servient estate)*; Cleaves, 103 Me. at 160, 68 A. at 859* (grantees may exercise their rights in a reasonably convenient manner to accomplish the purpose of the easement); *Morissette v. Somes*, 2001 ME 152, ¶ 10, 782 A.2d 764 (the reasonableness of improvements or repairs made by the owner of the dominant estate on an easement for a right of way is a question of fact for the trial court)(citation omitted); *Beckwith v. Rossi,* 157 Me. 532, 536, 175 A.2d 732, 735 (1961) ("The reasonable use and enjoyment of an easement is to be determined in the light of the situation of the property and the surrounding circumstances."); *Ware v. Pub. Serv. Co.*, 412 A.2d 84, 86 (Me. 1980) ("grantee of an easement, although restricted in his enjoyment of the right to the extent of the legitimate meaning of the grant, may take any action reasonably necessary to insure the full enjoyment of the right")*; see also Gendron v. Central Maine Power Company,* Me., 379 A.2d 1002, 1005 (1977) and *Perkins v. Perkins*, 158 Me. 345, 184 A.2d 678 (1962)). If an easement is used in a manner outside the scope of the easement, that use is an overburden on the dominant estate.[24]

---

[24] If a party contends that the use would be inconsistent with an easement's original purpose, as the Nicolases here assert, the trial court must evaluate whether, in the context of the uses contemplated by the original parties, the challenged use will overburden the servient estate. *See Sleeper*, 2013 ME 112, ¶ 21, 83 A.3d 769; *Flaherty*, 2011 ME 32, ¶ 74, 17 A.3d 640. The analysis of whether a use is an overburden is the same as the analysis to determine if the use is within the scope of the easement. *Laux v. Harrington*, 2012 ME 18, ¶ 29, 38 A.3d 318; *Flaherty*, 2011 ME 32, ¶ 74, 17 A.3d 640 ("The court's overburdening analysis evaluate[s] whether it is reasonable to conclude that a particular use was within the contemplation of the parties to the conveyance and, in that context, whether the contested

The owner of the servient estate generally retains all rights to the soil and use not inconsistent with the grantee's paramount rights. *Kaler*, 49 Me. at 208.; *see also Chandler v. Goodridge, 23 Me. 78, 82 (1843) (*"by the location of a way over the land of any person, the public have acquired an easement, which the owner of the land cannot extinguish or interrupt; but the soil and freehold remain in the owner, although encumbered by the way")(citation omitted); *see also Littlefield v. Hubbard*, 120 Me. 226, 230, 113 A. 304, 306 (1921) ("Whatever the defendant's right of passage over the way, if any, she had no right to build a concrete walk or otherwise disturb the soil upon the fee of the plaintiff."). "[A]n easement for a right of way, without more, does not permit the grantee to 'disturb the soil upon the fee' of the owner of the servient estate." *Davis v. Bruk*, 411 A.2d 660, 666 (Me. 1980). In *Davis v. Bruk*, the Court determined that disturbing the soil in order to pave the way was unreasonable, exceeded the scope of the easement, and thus overburdened the servient estate. *Id.*[25]

No party has a right to unilaterally alter the location or scope of an easement, unless such a right is reserved or granted in the deed. *Id. at 664.* However, if part of an easement has had its soil developed by changing the grade or scheme to create a more convenient passage over part of the easement, then an extension matching the grade or scheme may be constructed as long as the expansion is still within the scope of the easement and reasonable under the circumstances. *See*

---

use made of the servient estate by the dominant estate exceeds the rights granted to the user." quoting *Poire v. Manchester*, 506 A.2d 1160, 1163 (Me. 1986)). Whether a use is an overburden is a question of fact. *Laux*, 2012 ME 18, ¶ 29, 38 A.3d 318

[25] The Court notes that trial courts have had divergent views on the validity of *Davis* and *Littlefield*. In *Halling v. Moynihan*, the York Superior Court (*Fritzsche, J.*) observed "*Littlefield* was based on *Burr v. Stevens*, 90 Me. 500, 38 A. 547 (1897). It appears that the 1921 *Littlefield* doctrine which was used to prohibit the paving of the driveway in 1980 arose in a case from 1897 where the defendant may not have had an easement at all. The *Burr* case may more properly be limited to highways where private citizens cannot make alterations." *Halling v. Moynihan* No. CV-950438, 1996 Me. Super. LEXIS 176, at *4 (June 19, 1996). *But see Alderette*, 2018 Me. Super. LEXIS 57 (citing *Davis and* quoting *Littlefield* to support a finding that the scope of the 10-foot-wide easement did not include the right to disturb the soil because the evidence suggested it was meant to merely be a pass for ingress and egress by foot and vehicles that would not damage the property.)

*Rotch v. Livingston,* 91 Me. 461, 40 A. 426 (1898) (holding that a grantee may widen a road because widening the road was within the scope of the easement; the expansion could be constructed to match the existing road's properties.) The ultimate question is whether the proposed or disputed use of the easement is reasonable to achieve the purpose of the easement without exceeding the scope (thus overburdening it).

Based upon the evidence presented to the Court, the objectively manifested intentions of the parties to the original conveyance, and circumstances shortly before and after the easement was created, the Court declares the scope of the ROW as follows.

1. **The ROW was intended to provide driveway access to Lots 1, 2 and 4, and the surface of the driveways may be paved or graveled, but the driveway for Lot 1 cannot extend past the red pine tree.**

It is evident that the ROW was created with the intent and for the purpose of providing driveway access to Lots 1 and 4, and optional driveway access for Lot 2.[26] After creating the subdivision and selling Lots 1, 2 and 4 according the Plan, the original grantor, Bruce Allen, ensured the purchasers were granted a right to use Abner Point Road. In recognition of that right and convenience, Allen created the ROW to provide vehicle access from Abner Point Road to Lots 1, 2 and 4. Lots 1 and 4, in particular, have no other access to Abner Point Road. In order to ensure Lot 5 could not prevent Lots 1, 2 and 4 from building a driveway over the ROW connecting to Abner Point Road, there is a building restriction on the portion of Lot 5 through which the ROW runs.

The original intent to have the ROW serve as driveway access is further evidenced by the layout of the ROW within the Abner Point Subdivision. The ROW terminates at Merriconeag

---

[26] It follows that parking in the ROW is impermissible, except briefly as necessary to support maintenance and servicing of the ROW and adjacent properties. When brief parking is necessary, the driver of the vehicle should pull to the side of the ROW, if possible, to allow other vehicles to pass by. The driver of the parked vehicle must always remain with or near the vehicle, so that the parked vehicle can be promptly moved as necessary or upon request.

22

Sound; there is no through passage for vehicles beyond that point. There is a 10-foot-wide walking easement that follows along the shore of Lot 1, but that walking easement does not permit vehicle traffic. Thus, there is no place for vehicles using the ROW to go, other than to Lots 1, 2 and 4. Moreover, the terminus of the ROW is not wide enough to reasonably accommodate a turn-around or a cul-de-sac. If a vehicle were to drive all the way to the end of the ROW at Merriconeag Sound, it would need to back all the way out. Vehicle use of the ROW for driveway access to Lots 1, 2, and 4 is the only purpose that makes objective sense. The ROW was not intended as a dead-end road to allow *vehicles* to drive all the way to the edge of Merriconeag Sound. That is why the ROW provides *walking* access all the way along its length, right up to the Sound.

The evidence also establishes that intent was for the ROW to serve as a driveway for a single point of vehicle entrance into each lot. Lots 1, 2 and 4 are limited to residential use and a single residential dwelling on each lot. The lots cannot be used for commercial, business, or livestock activities, which might necessitate multiple points of vehicle entry into each lot from the ROW. Thus, this is not a situation where the grantor intended free and convenient vehicle passage into each lot from every feasible point along the ROW. Indeed, when the Allens were still living in the area, multiple ornamental trees were planted in the ROW starting near the big red pine tree where the ROW begins to slope steeply downward, manifesting an intent to disallow use of the lower portion of the ROW for vehicle driveway access into Lot 1. No lot owners objected, and indeed all lot owners at the time acquiesced to the trees being planted in the ROW. Indeed, vehicles have never regularly used the lower portion of the ROW past the pine tree. There is only one driveway from the ROW into Lot 4, and this is the intended model for Lots 1 and 2.

Moreover, the Court finds that the parties to the original conveyance could not reasonably have intended that the entire length of the ROW should be used as a driveway or accessible to

23

residential vehicles. The ROW topography has not been altered since the Allens created the easement. The slope and ledges in the ROW make the ROW unsuitable for vehicle or driveway use in the stretch beginning at the red pine and proceeding to Merriconeag Sound. It is no accident that the Allens placed the southeasterly boundary of Lot 1 with enough space to accommodate a driveway connecting to the ROW on the flat section of the ROW in front of the big pine tree. Therefore, it is a reasonable conclusion that the parties to the original conveyance understood that the ROW's topography would act as a natural limiting element to vehicular traffic and intended vehicle traffic for the driveway into Lot 1 to stop in the flat area just before the red pine. It was not reasonably foreseeable that the stretch of the ROW past the red pine tree would be used for vehicle traffic. Altering the surface and subsurface of the ROW to accommodate safe vehicle traffic for a driveway extending past the red pine would unreasonably burden the servient estate. The right of Lots 1 and 2 to use the ROW for vehicle traffic does not extend past the red pine.[27]

The Allens made the ROW 20 feet wide, but they did not intend that all 20 feet of the width should be used for vehicle traffic, or even necessarily the centerline of the ROW. The ROW is 20 feet wide for several reasons. First, the ROW is simultaneously intended for foot traffic along with vehicle use. A 20-foot-wide ROW accommodates a pedestrian walking along-side a driveway used by vehicles, with sufficient space to avoid a safety hazard. Second, a driveway can be located within the ROW in such a fashion as to accommodate objects in the ROW, while still allowing vehicles to pass. Long before the Nicolases purchased Lot 4, there was no objection to the owners of Lot 4 placing a granite light post in the ROW just right of center, because vehicles could pass to the left of the post. Similarly, driveways into the lots could be flared out to accommodate turn

---

[27] The determination that vehicular rights do not extend past the red pine also prevents overburdening of Lot 4 by negating the Nicolases' concerns about Plaintiffs and their guests speeding past the pine into their backyard/lawn area or disturbing the shoreline.

24

radius as necessary. The driveway into Lot 4 is 10 feet wide, but it is wider at the point that the driveway intersects with Abner Point Road in Lot 5. Finally, Lots 1, 2, and 4 are restricted to residential use. A 10-foot-wide driveway is appropriate to serve residential lots, as illustrated by the driveway into Lot 4, and the grantor could not reasonably have intended for any such driveway to take up the entire width of the ROW, or to be located in such a fashion as to prohibit the servient estate for any other use of the land in the ROW. A driveway any wider would be unreasonable given the intent and circumstances of the properties and would thus constitute an overburden on Lot 4.[28]

The Allens, in creating and conveying the ROW, intended that the surface of the driveways into Lots 1, 2 and 4 could be gravel or pavement. The driveways into Lots 6 and 4 are paved, as is Abner Point Road up to and just past the boundary of Lot 2, after which it becomes gravel. The surface of the ROW from Abner Point Road to the corner of Lot 1 in front of the red pine is flat and grassy. A gravel or paved driveway can be easily constructed in this area without overburdening Lot 4. The stretch of the ROW leading to Lot 4 is already paved. A short extension of the grade and paved surface will not change the nature or use of the ROW, fits comfortably within the objectively manifested intent of the parties to the original conveyance, and serves the intended purpose of the ROW. Therefore, the owners of Lots 1 and 2, at their own expense, may construct a paved or gravel 10-foot-wide driveway that naturally continues the existing driveway to the left of the granite post, to a single point of entry into Lot 2 at any feasible point along the

---

[28] Plaintiffs argue that because they were granted rights to the entire ROW that they have the right to pave the entire ROW. Upon review of the case law, the court finds this argument to be in error. Only when an easement is created for the purpose of a road does the scope of the rights include the right to pave the entire easement to make a road. *See Rotch v. Livingston,* 91 Me. 461, 474, 40 A. 426, 432 (1898) ("If the grant is of the right to use the whole of a specified width of land *for a road* it follows logically, in the absence of restrictive words in the grant, that the grantee can fit the entire width for use. His right to *make a road* is as wide as his right to a road so far as width of road is concerned.")(emphasis added). The ROW is not a road, and it was not intended to serve as a road. Had the Allens intended for the ROW to be a road, they would have designated it as such on the Plan. Therefore, Plaintiffs do not have the right to pave the entirety of the ROW.

25

ROW, and a single point of entry into the southeasterly corner of Lot 1 in the flat area before the red pine.[29] The driveway cannot extend past that point. Appendix 2 illustrates the approximate permissible location of the driveway into Lot 1.[30] This configuration will allow Lots 1 and 2 to have sufficient vehicular access for everyday travel and land development as intended by the Allens. A similar driveway can be located from the ROW into Lot 2. The driveway into Lot 4 can remain as it currently exists and be maintained over time.

To facilitate Plaintiffs' reasonable use of the ROW consistent with its scope and for its intended purpose as described above, the Nicolases' granite light post must be relocated no less than three feet to the right (toward Lot 4). As discussed above, the current location of the granite post is acceptable for occasional vehicle use of the ROW by contractors and landscapers. However, the post is too close to permit safe, regular use of the ROW by vehicles passing over a driveway to Lots 1 and 2. Pedestrians need to be able to walk to the side of the driveway, and the owners of Lots 1 and 2 need to be able to provide for snowplowing and other maintenance activities without unreasonable interference from the granite post. Relocating the granite post at least three feet to the right provides the dominant estates with full use of the ROW consistent with its scope and for its intended purpose, without overburdening the servient estate.

2. **The ROW was also intended to provide walking water access to the Sound.**

The ROW's second purpose is to provide Lots 1, 2, 5, and 6 with walking access to Merriconeag Sound. Had the Allens intended to limit use of the ROW to a driveway for vehicle traffic, they would have terminated the ROW in the flat area near the southeasterly corner of Lot

---

[29] If Prime desires to construct a driveway to accommodate vehicle traffic to the northeasterly corner of Lot 1, Prime can construct said driveway on its own land within the boundaries of Lot 1.

[30] If the illustration contained in Appendix 2 is not sufficient for the parties to agree upon the precise location of where the driveway can be built in the ROW, or if the parties need an officially sanctioned metes and bounds description of the permissible driveway location, any party can petition for supplemental relief pursuant to 14 M.R.S. § 5960 or move for relief under M.R. Civ. P. 60(b). *See, e.g. Testa'S, Inc. v. Coopersmith*, 2015 Me. Bus. & Consumer LEXIS 46 (July 2, 2015)(*Horton, J.*).

1, and failed to grant walking rights to Lots 1, 2, 5 and 6. Further, the ROW connects to the ten-foot walking easement in common along the shoreline of Lot 1, so it is reasonable to conclude the ROW provides walking access to the walking right-of-way through Lot 1.[31]

The existence of this second purpose undermines Plaintiffs' argument that if they are not permitted to construct a paved or gravel driveway over the full length and width of the ROW, they will be unreasonably deprived of the full use of the ROW. Not so. Even though Plaintiffs are not permitted to construct a driveway to operate vehicles over the entire ROW, they will still be able to walk the full length and width of the ROW. Thus, as the parties to the original conveyance intended, Plaintiffs have full, reasonable use of the ROW that is consistent with its purpose and scope.

## II. Trespass

The Nicolases seek damages for both timber trespass and common law trespass. The Court addresses the claim for timber trespass first.

Timber Trespass

Under Maine law, a person may not "[c]ut down, destroy, damage or carry away any . . . ornamental . . . tree . . . from land not that person's own" without permission of the owner. 14 M.R.S. §7552(2)(A). Violation of the law is referred to as a "timber trespass." *See Bray v. Grindle,* 2002 ME 130, ¶ 11, 802 A.2d 1004 ("Pursuant to the timber trespass statute, 14 M.R.S.A. § 7552…"); *Dionne v. LeClerc*, 2006 ME 34, ¶ 3, 896 A.2d 923 ("statutory timber trespass damages pursuant to 14 M.R.S. §§ 7552 and 7552-A…"). If the lost trees are ornamental, the owner may

---

[31] Grantees are limited to using the width of ROW 1 to access the Sound. They should take care not to stray outside of the ROW onto portions of Lot 4 where they have no usage rights. Such wandering would be outside the scope of their easement rights.

pursue damages for "the costs of replacing, replanting and restoring the trees with trees of comparable size and the same or equivalent species and the actual costs for cleanup of damage caused during the cutting." 14 M.R.S. §7552(3)(B)(4). Additionally, "[a] person who intentionally or knowingly violates" the prohibition against timber trespass "is liable to the owner for 3 times the owner's damages" or $500, whichever is greater. 14 M.R.S. § 7552(4)(B). "A person who with malice violates" the prohibition is also subject to punitive damages. 14 M.R.S. § 7552(4)(B). An award of punitive damages must be supported "by clear and convincing evidence that the defendant's conduct was motivated by actual ill will or was so outrageous that malice is implied." *Fine Line v. Blake*, 677 A.2d 1061, 1065 (Me. 1996). Finally, the owner may additionally recover interest, costs, and attorney fees, and so long as the perpetrator has written or actual notice that a claim is being asserted, expert costs and fees. 14 M.R.S. § 7552(5).[32]

Here, Fullerton was acting in part on behalf of Prime, and no party has disputed that she was acting within the scope of her duties as the Manager of Prime. She both authorized and committed the trespass, and both she and Prime are liable for her actions. *See Martin v. Brown*, 650 A.2d 937, 939 (Me. 1994); *Bonk v. McPherson*, 605 A.2d 74, 78 (Me. 1992). But Fullerton was also acting on her own behalf, because where she intended to locate the driveway onto Lot 1 was driven in part by her desire to protect her views from Lot 5. Accordingly, Prime and Fullerton are joint and severally liable for the damages related to the cutting of any tree that did not interfere with their easement rights in the ROW, since removing trees that did not need to be removed constitutes an act exceeding Prime and Fullerton's easement rights.

---

[32] An offer of settlement made 10 days before trial might preclude recovery of interest, costs, and fees, 14 M.R.S. § 7552(6), but there is no evidence that such an offer was made in this case.

28

As described above, none of the four trees needed to be cut down and destroyed. The canopy of the juniper tree grew into the ROW, but vehicle traffic and walkers could still easily pass by on the left of the tree. To the extent additional space was required to allow both vehicles and walkers to pass by, the tree could have been carefully and professionally been pruned back rather than destroyed. The native cherry tree posed no interference with reasonable use of the ROW, as there was sufficient space in front of the tree to locate a driveway into the southeasterly corner of Lot 1. Fullerton never even considered transplanting the cherry tree to a different location. The two weeping cherry trees presented no obstacle to reasonable use of the ROW within its scope, as described above, and thus Fullerton had no reason to cut down the two weeping cherry trees. As consequence, Fullerton, personally and on behalf of and as an agent of Prime, committed timber trespass with respect to all four trees.[33]

It is beyond dispute that Fullerton intentionally cut down, destroyed, and carried away four ornamental trees in the ROW. That alone is sufficient to award triple damages under the statute. But she also did so knowingly. For an act to be considered "knowing" within the meaning of the timber trespass statute, "the defendant must be subjectively aware that the cutting is improperly taking place on another's land." *Bonk*, 605 A.2d at 77. Here, the evidence establishes that Fullerton was subjectively aware she was improperly cutting the trees on the Nicholases' land. She knew the Nicholases disputed her right to cut down the trees. *See Grant v. Warren Bros. Co.*, 405 A.2d 213, 220 (Me. 1979) (defendant on notice about the dispute). She refused to wait for the legal process to unfold. She did not consult with an arborist or forester about relocating the trees. She

---

[33] The Nicholases can replant the weeping cherries (or their equivalent) in the approximate location of the stumps. The Nicholases can also replant the native cherry and the juniper, but in order to avoid tensions and disputes, not until after the driveway into Lot 1 has been built consistent with this judgment, and then in the approximate location of the stumps but no closer to the driveway than 4 feet. The Nicholases must prevent any tree canopy that develops from interfering with reasonable use of the driveway.

attempted to cut the trees down while the Nicolases were not present. In sum, Fullerton intentionally and knowingly violated the statute.

Fullerton's conduct was utterly outrageous and motivated by ill will. In our society, resorting to self-help with a chainsaw is not an acceptable method of dispute resolution. Fullerton knew the Nicolases opposed her plan to cut down trees and construct a driveway down the length of the ROW. The Nicolases were trying to work out the issues through the legal process, and both sides had engaged attorneys. The Nicolases, through their attorney, had served a notice on Fullerton of their intent to use legal means to terminate the ROW. Unwilling to let the legal process run its course and delay her plans, Fullerton responded by buying a chainsaw and cutting down four beautiful ornamental trees that did not need to be cut down. Fullerton's conduct exceeded all bounds of civilized society. It demonstrated a flagrant distain and disregard for the Nicolases, their property rights, and the rule of law. Her conduct reflected malice, actual and implied.

Her conduct is especially wanton because she has no training in how to operate a chainsaw or how to fell a tree. Fullerton is not an arborist or forester, nor she did consult with an arborist or forester about removing or transplanting the trees. She treated cutting down the four trees as a warm-up for eventually cutting down the larger trees in the ROW. Operating a chainsaw to fell trees is a notoriously dangerous activity, even for professionals. According to the Centers for Disease Control, "[e]ach year, approximately 36,000 people are treated in hospital emergency departments for injuries from using chain saws." *Preventing Chain Saw Injuries During Tree Removal After a Disaster*, C.D.C. (Oct. 17, 2017) https://www.cdc.gov/disasters/chainsaws.html. Apart from gloves, Fullerton wore no safety equipment while running her chainsaw. Instead, she undertook her work in a tee shirt, jeans, and sneakers. And then, when confronted by the Nicolases on their land, Fullerton was malicious and verbally attacked *them*.

Based on all of the above, the Nicolases are awarded timber trespass damages jointly and severally against Prime and Fullerton as follows. The Nicolases are awarded basic damages of $45,600, which represent the cost of replacing, replanting, and restoring the trees with trees of comparable size and the same or equivalent species. In addition, the Nicolases are awarded $136,800, which is three times the amount of the basic damages, for knowingly and intentionally cutting down the four ornamental trees. As punitive damages for the malicious conduct of Fullerton, the Nicolases are awarded an additional multiplier of two-times the basic damages, which is $91,200. In total, the Nicolases are awarded $273,600 in joint and several damages against Prime Properties ME LLC and Fullerton for timber trespass. The Nicolases are also awarded interest, costs, expert costs and fees, and attorney fees. The Nicolases can submit an affidavit establishing interest, fees, and costs within 30 days of this decision.[34]

Common Law Trespass

Recovery under both the timber trespass statute and common law trespass is not allowed for the same tree damage. *Fuschetti v. Murray*, 2006 ME 100, ¶ 13, 903 A.2d 848. But the analysis of common law trespass does not stop there. A person is liable for common law trespass if she "intentionally enters land in the possession of the other, or causes a thing or a third person to do so." *Medeika v. Watts,* 2008 ME 163, P5, 957 A.2d 980, 982. Damages are not an essential element and nominal damages are "presumed to flow from a legal injury to a real property right." *Id.* (citation omitted). Easement holders that exceed the scope of their easement have committed a trespass and are liable for any damage they cause. *See Gendron,* 1981 Me. Super. LEXIS 87, at

---

[34] The Nicolases have already submitted an interim request for fees and costs through trial in the amount of $28,493.84. The Nicolases must submit any supplemental request within 30 days of this decision. Once the Nicolases have submitted their supplemental request, Plaintiffs will have 21 days to object to any specific entries in the interim or supplemental requests. The Nicolases will have 7 days to file any reply.

*4; *Colquhoun,* 684 A.2d 405, 408 (Me. 1996)*; Cote,* 2018 Me. Super. LEXIS 76, at *14-15*; Kaler*, 49 Me. 207, 209 (1860)("If the defendants in any manner exceeded the above limitations of their rights they would thereby become trespassers, and become liable for so much damage, as they might occasion to the plaintiffs by such excess."); *Beckwith*, 157 Me. 532, 175 A.2d 732 (1961); *Alderette*, 2018 Me. Super. LEXIS 57, at *12-13; *Littlefield,* 120 Me. 226, 113 A. 304 (1921). Punitive damages are available for common law trespass, provided there is clear and convincing evidence of malice, express or implied.

Acting in her personal capacity, in April 2018 Fullerton intentionally and without consent walked onto the Nicolases property in order to snoop around. She walked all around the curtilage of the Nicolases' house while they were not present. Fullerton was not on or even close to the ROW. She had absolutely no purpose in entering upon the Nicolases' property, other than to exercise dominion over the property and satisfy her own illegitimate interests. She had recently outbid the Nicolases for Lots 1 and 2, was making plans to cut down trees and construct a driveway over the ROW, already owned Lots 5 and 6, and acted imperiously as if she owned Lot 4 as well. Her conduct was outrageous and demonstrated contempt for and ill-will toward the Nicolases and their property rights. Her conduct reflected malice, express and implied. Accordingly, the Nicolases are awarded $1 in nominal common law trespass damages, along with $5,000 in punitive damages, against Karen Fullerton personally, along with interest, fees, and costs. This award of damages is in addition to the timber trespass damages described above.

## CONCLUSION

In conclusion, the purpose and scope of the ROW have been declared as described above. The declarations resolve Plaintiffs' Counts II and VII, and the Nicolases' Counterclaim Count II. Judgment is granted in part and denied in part for Plaintiffs and the Nicolases on each of those

32

Counts, as provided herein. A paved or gravel driveway for Lot 1 can be constructed as shown in Appendix 2.

In Count VIII, Plaintiffs seek a permanent injunction. However, Plaintiffs have not shown that the Nicolases will fail to comply with a final judgment resolving this dispute. Accordingly, judgment is granted in favor of the Nicolases on Count VIII of the Complaint.

Additionally, judgment is granted in favor of the Nicolases on Counterclaim Counts IX and X. The Nicolases are awarded damages joint and severally against Prime Properties ME, LLC and Karen Fullerton for timber trespass in the amount of $273,600, along with interest, costs, expert costs and fees, and attorney fees. The Nicolases are also awarded damages against Karen Fullerton for common law trespass in the amount of $5,001, along with interest and costs. (The common law trespass damages awarded against Karen Fullerton are in addition to, not concurrent with, the timber trespass damages.)

So Ordered.[35]

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Order by reference on the docket for this case.

Dated: **04/12/2022**
Nunc pro tunc 03/03/2022

Michael A. Duddy
Judge, Business and Consumer Court

Entered on the docket: 04/12/2022

---

[35] With this judgment, all remaining unresolved Counts in the Complaint and Counterclaim have been decided.

33

STATE OF MAINE                                    BUSINESS AND CONSUMER COURT
CUMBERLAND, ss.                                   DOCKET NO. BCD-RE-2019-00009


KINDERHAUS NORTH LLC,                    )
PRIME PROPERTIES ME LLC,                 )
KAREN and BRIAN FULLERTON,               )
                                         )
                                         )
          Plaintiffs/                    )
          Counterclaim Defendants,       )
                                         )
                                         )
v.                                       )
                                         )
KARL and STEPHANIE R. NICOLAS,           )
                                         )
          Defendants/                    )
          Counterclaim Plaintiffs.       )
                                         )
                                         )       JUDGMENT FOLLOWING
                                         )       BENCH TRIAL
                                         )
KINDERHAUS NORTH LLC,                    )
PRIME PROPERTIES ME LLC,                 )
KAREN and BRIAN FULLERTON,               )
                                         )
          Third-Party Plaintiffs,        )
                                         )
v.                                       )
                                         )
H. ALLEN RYAN and DIANNE E.              )
RYAN,                                    )
          Third-Party Defendants.        )
                                         )

        This case involves a dispute over the scope of a right of way, timber trespass, and common

law trespass, all involving properties on Bailey Island in Harpswell, Maine. The case was tried to

the Bench on August 30 & 31, 2021.[1] The parties submitted post-trial briefs in lieu of closing

---

[1] Karen Fullerton, Plaintiff/Counterclaim Defendant; Brian Johnson, professional land surveyor; and Thomas Emery, landscape architect, testified on behalf of the Plaintiffs/Counterclaim Defendants. Karl and Stephanie Nicolas, Defendants/Counterclaim Plaintiffs; Jacob Pierson, owner and operator of a tree nursery; Roxanne York, real estate agent in Harpswell; and Susan Allen Favreau, the previous owner of one of the properties involved, testified on behalf of Defendants/Counterclaim Plaintiffs. The Third-Party Defendants, Allen and Dianne Ryan, did not participate in the trial or in the litigation generally.

1

arguments on November 5, 2021. The parties submitted post-trial reply briefs on November 19, 2021. On November 23, 2021, 2021, Karl and Stephanie Nicolas filed a Motion to Strike, to Seal & Impound, and for Sanctions, all directed at Plaintiffs' post-trial briefing. The Motion to Strike was not fully briefed until December 21, 2021. Consequently, although the trial occurred in August 2021, this case was not fully briefed and ready for consideration until December 21, 2021.

## FINDINGS OF FACT

The Court has carefully weighed the credibility of the parties and witnesses. Based on the Court's first-hand observations of the right of way during two site visits,[2] the parties' stipulations, and the evidence adduced at trial, and drawing all reasonable inferences therefrom, the Court makes the following findings of fact.[3]

### I.      Subdivision Conveyance History

The parties to this action are record fee owners of certain lots depicted on the Plan of Abner's Point Lots on Bailey Island, Harpswell, Maine for Bruce Allen dated August 1979 and recorded September 29, 1979 in the Cumberland County Registry of Deeds, Book of Plans, Volume 124, Page 60 ("the Plan"). At the time the Plan was created, the property was owned by Bruce and Joanne Allen (the "Allens").[4] The Plan subdivided the Allens' parcel into Lots 1-6 (hereinafter the "Abner's Point Subdivision or the Subdivision).[5] See Illustration No. 1. The Allens ultimately conveyed all of the lots and are thus the grantors in the analysis that follows.

---

[2] At the request of the parties, Judge Duddy conducted formal site visits on October 6, 2020, and June 30, 2021, accompanied by counsel and the parties who wished to be present.
[3] The findings of fact are made by a preponderance of the evidence, but the findings of fact necessary to support the award of punitive damages are made by clear and convincing evidence.
[4] The Plan was approved by the Town of Harpswell's Planning Board and recorded.
[5] The lots that are the subject to this dispute are Lots 1, 2, 4, 5, and 6. Lot 3 is not subject to this dispute, and it is therefore not discussed in this decision.

The subdivision conveyance history and deed language were previously described in detail in this Court's order on cross motions for summary judgment. *See Kinderhaus N. LLC, et al. v. Nicolas*, No. BCD-RE-19-09, 2020 Me. Bus. & Consumer LEXIS 13 (April 23, 2020). Those facts are incorporated herein but are not repeated, except in summary fashion.[6] In 1979, the Allens conveyed Lots 1, 2, and 3 to Allen and Carolyn Wilson (the "Wilsons"), and Lot 4 to Edward and Florence Schaub (the "Schaubs"). Lot 4 changed hands several times, and was eventually acquired by Neal and Susan Favreau in 2003. In 2006, the Wilsons conveyed Lots 1 and 2 to Allen and Dianne Ryan (the "Ryans"). Despite earlier conveying Lots 1, 2, 3, and 4, the Allens retained Lots 5 and 6 until 2016. The Allens thus continued to own a portion of the original property during most of the history of the subject right of way.

Karen Fullerton ("Fullerton") and her husband Brian Fullerton (together the "Fullertons") are residents of New Jersey. The Fullertons are the current owners of Lots 5 and 6. The Fullertons purchased their lots in 2016 from the Allens (and family trusts set up for the Allens). Both Lots 5 and 6 have waterfront on Mackerel Cove. Lot 6 contains a house which the Fullertons use as a second home. Lot 5 is undeveloped, although it contains a tennis court. The Fullertons hope to eventually build a house on Lot 5 for themselves. At the time the Fullertons purchased Lots 5 and 6, the driveway to the house on Lot 6 was paved, and Abner Point Road was paved all the way through Lots 5 and 6.

Prime Properties ME LLC ("Prime") and Kinderhaus North LLC ("Kinderhaus") are Maine limited liability companies. Karen Fullerton ("Fullerton") is a member of both Prime and Kinderhaus, and she is the Manager of both companies.[7] Prime is the current owner of Lot 1. Lot

---

[6] Further, the parties have stipulated to the chain-of-title for all the properties and have stipulated all the source deeds into evidence as Joint Trial Exhibits.

[7] The Fullertons, Prime, and Kinderhaus are sometimes referred to collectively herein as "Plaintiffs."

1 is undeveloped. It has waterfront on Merriconeag Sound. Kinderhaus currently owns Lot 2. Lot 2 is mostly undeveloped, but it does contain an open air, timber frame pavilion-style structure. On behalf of Kinderhaus, Fullerton may convert the structure on Lot 2 into a garage. Lot 2 does not have any waterfront. Prime and Kinderhaus purchased their respective lots in May 2018 from the Ryans. At the time Prime and Kinderhaus purchased Lots 1 & 2, Abner Point Road was paved to the beginning of Lot 2, and thereafter the road converted to a gravel surface. The driveway to Lot 4 was paved, and all the trees and the granite light post in the ROW were also already installed by predecessors-in-title to Lot 4.

Karl Nicolas and his wife Stephanie Nicolas are residents of Virginia. The Nicolases are the current owners of Lot 4 of the Abner's Point Subdivision. They first looked at the property in the summer of 2017 when it was for sale; they agreed to a purchase price in September 2017; and they closed on their purchase of the property in April 2018. They purchased Lot 4 from the Favreaus. Lot 4 has waterfront on Merriconeag Sound. The property contains a house which the Nicolases use as a second home, especially in the summers. They hope to retire to the property. At the time the Nicolases purchased Lot 4, the driveway to the property was paved. As discussed below, all the disputed trees and granite light post had been installed by the Nicolases' predecessors-in-title at or shortly after the original conveyance of the subject ROW. The Allens and all the lot owners at the time acquiesced, and none of the lot owners objected. The Nicolases have not placed any obstructions in the ROW.

The operative deeds in the chain of title for Lots 1, 2 and 4 specify that the lots shall only be used for "single family residential purposes," and that only one single family residential dwelling shall be permitted on each lot. The deeds prohibit Lots 1, 2 and 4 from being used for any trade, business, or commercial activity, and prevent the keeping or maintaining of livestock,

animals, or poultry on the lots other than as household pets. The operative deeds in the chain of title for Lots 1 and 2 also contain the following language:

> The above described Lot 1 and Lot 2 are conveyed with the benefit of a twenty (20) foot wide right of way for vehicular as well as foot traffic. Said right of way being located on the southwesterly boundary line of Lots 4 and 5 and to be used in common with the owners of Lot 4. For a more particular description of the Lots and rights of way, reference may be had to the aforesaid Plan of ABNER'S POINT.

The operative deeds in the chain of title for Lot 4 contain the following matching language:

> The above described Lot 4 is conveyed subject to a twenty (20) foot wide right of way for vehicular as well as foot traffic for the benefit of the owners of Lots 1 and 2 on said Plan of ABNER'S POINT. Said right of way being located on the southwesterly boundary of Lot 4. For a more particular description of the Lot and rights of way, reference may be had to the aforesaid Plan of ABNER'S POINT.

Based on this language, the Court previously determined that Prime (owner of Lot 1) and Kinderhaus (owner of Lot 2) have express deeded easement rights to a twenty-foot wide strip of land along the southwestern border of the Nicolases property (Lot 4) for "vehicular as well as foot traffic" (hereinafter the "ROW"). *Id.* at *11.[8] The purpose and scope of the ROW is the subject of this case.

The Abner's Point Subdivision extends the width of Bailey Island with waterfront on either side. On the northwestern border of the Subdivision lies Merriconeag Sound ("the Sound"). Mackerel Cove is to the southeast. The Plan is bisected east to west by Abner Point Road. Abner Point Road is a private road that existed at the time the subdivision was created, extending westward to adjacent properties and eastward to Route 24. It is the only means of driving on and off Abner Point and the deeds to all the lots provide the right to use Abner Point Road. Abner Point

---

[8] Based on other language in the relevant deeds, the Court also previously determined that the Fullertons (owners of Lots 5 and 6) have express deeded easement rights to a walking ROW over the same 20 ft wide strip of land for the purpose of providing walking access to Merriconeag Sound. *Id.* at *14.

5

Road runs through portions of Lots 2, 5, and 6. Lots 1 and 4 only connect to Abner Point Road via the ROW. At all relevant times, Abner Point Road has been paved through Lots 5 and 6 and several feet past the intersection of the ROW at Lot 2. Beyond that point the surface of Abner Point Road becomes gravel as it passes through the remainder of Lot 2.

## II.    The Right-of-Way

The ROW, as shown on the Plan, is twenty (20) foot wide, beginning in Lot 5 on the northwest side of Abner Point Road and running in a northwest direction to Merriconeag Sound along the southwestern border of Lots 5 and 4 (and adjacent to the southeastern boundary of Lots 2 and 1).[9] The ROW is depicted on the Plan as being undeveloped. As discussed below, except for the portion of the ROW paved as a driveway for Lot 4, the ROW is still undeveloped. The surface of the ROW is mostly grass. The portion of the ROW that runs through Lot 5 on the Plan is marked as being in a no building zone. The northwest terminus of the ROW in Lot 4 dead-ends at Merriconeag Sound and is in a shoreline zone. The shoreline at the terminus is undeveloped, rocky, steep, difficult to traverse, and vegetated by naturally occurring shrubs and grasses.

The ROW is flat until roughly twenty-five feet past the point where the boundary line between Lots 1 and 2 intersects with the ROW. The flat surface of the ROW ends right about where a large red pine tree is located (more on this tree later). Proceeding northwest towards Merriconeag Sound from the pine tree, the ROW begins to markedly slope downwards before flattening out somewhat in the shoreland zone near the ROW's terminus. After the red pine tree scattered outcrops of ledge begin protruding through the surface of the soil. Accordingly, proceeding in a northwesterly direction after the red pine tree, the ROW is not reasonably suitable

---

[9] The Plan also shows a right-of-way that starts on the southeastern side of Abner Point Road in Lot 5 and runs in the southeastern direction along Lot 5's southwestern border to Mackerel Cove. This right-of-way is not the subject of this dispute.

6

for residential vehicle traffic or for use as a residential driveway.[10] Apart from a contractor using a tracked vehicle on one occasion to drive down the slope and over the ledges, vehicles have never used the stretch of the ROW below the red pine tree. The Nicolases use that portion of the ROW to walk and for recreation. Allowing regular traffic to drive down the slope and over the ledges protruding through the surface would cause a safety hazard to people in the ROW.

There is good vehicle access to the southeasterly corner of Lot 1 from the ROW in the flat, grassy, space before the red pine tree. The topography and surface of the soil in that portion of the ROW pose no problems to vehicle traffic or use as a driveway. Vehicles accessing Lot 1 in that area would pose no safety hazards. For these reasons, the stretch of the ROW before the red pine tree is the natural place from which to provide vehicle access to Lot 1.

Lots 1 and 4 are not connected to Abner Point Road and must rely on the ROW to access the road. As mentioned above, Lot 4 is accessed by a paved driveway located slightly to the right of center of the ROW and that runs from Abner Point Road across Lot 5 and into the southern corner of Lot 4. The paved driveway through Lot 5 is 10 feet wide, although it is wider where it intersects with Abner Point Road in order to accommodate vehicles turning on and off the Road. The paved driveway extends across Lot 5 and enters Lot 4. No other portion of the ROW is paved or improved in any way. The driveway to Lot 4 was paved when the original grantors, the Allens, owned Lot 5. No objections were raised. All the lot owners at the time acquiesced.

In contrast to Lots 1 and 4, Lots 2 and 5 may be directly accessed from Abner Point Road. Lot 2 may also be accessed from the portion of the ROW running through Lots 5 and 4. Lots 2, 5 and 6 do not have waterfront on Merriconeag Sound, and so those lots must rely on the ROW to

---

[10] On one occasion the Nicolases hired a contractor to trim trees (not in the ROW) in front of their house and near the Sound. The contractor used a tracked vehicle to navigate past the pine tree down the slope and over the ledges of the ROW. The landscaper whom the Nicolases hire to mow the ROW on the slope uses a push mower, rather than a riding mower, because of the gradient and presence of ledge outcrops.

access the Sound's waterfront.[11] Of note, the Plan also depicts a ten (10) foot walking right of way in common at the top of Merriconeag Sound's bluff along Lot 1's northwestern waterfront border. This walking right of way is not in dispute. The walking way connects to the northern terminus of the ROW where it meets Merriconeag Sound. From Abner Point Road to the Sound, the ROW is suitable for walking throughout its length.

In 2003 or 2004, the previous owners of Lot 4, the Favreaus, installed a granite light post right-of-center in the ROW, 11 feet from the boundary of Lot 1, and just beyond the Lot 4 driveway. The owners of Lots 1 and 2 did not object, nor did the Allens, who still owned Lots 5 and 6. The granite light post has electricity running to it. There is room for vehicles and foot traffic to pass the light post on the left, by using the left-hand side of the ROW. Indeed, service and other vehicles have driven on the ROW to the left of the light post. The ROW is clear and unobstructed to the left of the light post, and the ROW surface shows that vehicles have used the left-hand side of the ROW in the vicinity of the light post. Landscapers have successfully parked to the left of the granite post in the ROW to service Lots 1 & 2. At the time the Nicolases purchased Lot 4, a large ocean dock was placed for storage during the off-season in the ROW to the left of the granite post. All that being said, the space available for vehicles passing to the left of the granite post is tight, and would not easily accommodate regular vehicle passage, especially with people walking in the ROW. The space to the left would also not reasonably accommodate maintenance activities associated with a driveway, such as snowplowing. In order to reasonably facilitate regular vehicle traffic on a driveway to be placed to the left of the granite post, the post would need to be moved at least three feet to the right.

---

[11] Of course, Lots 5 and 6 have waterfront directly on Mackerel Cove.

## III. Trees in the Right-of-Way

Prior to the chainsaw activity of Karen Fullerton, which will be described below, there were nine trees in the ROW. The first of the trees, proceeding in a northwesterly direction from the light post, was an ornamental juniper (Juniperus spp.) that had been planted long before the Nicolases purchased Lot 4. The juniper was approximately thirty years old and was planted approximately twenty-five years ago (just before, at or about the time the Allens created the Abner's Point Subdivision and the ROW). As discussed below, this is one of the four trees Fullerton cut.[12] The juniper was planted on the far-right side of the ROW. The main stem of the tree had a caliper diameter (which is measured just above the root collar) of nearly 10 inches, and the tree had an elegant, spreading canopy that on the left extended into ROW as far as the light post. The tree was in excellent health and thriving in its location. The juniper was part of a larger, well-established landscape area on Lot 4 to the right of the ROW. There was room for vehicles to pass the juniper on the left, by using the left-hand side of the ROW. To the extent more room was reasonably required, the juniper's canopy could have been carefully pruned back rather than destroyed. Fullerton had no legitimate reason to cut down the main stem of the juniper.

Proceeding northwesterly in the ROW toward Merriconeag Sound, the second tree was an ornamental native cherry tree (Prunus virginiana). This is another one of the four trees cut down by Fullerton. The tree was located left of the ROW's center, approximately thirty-five feet beyond the paved driveway, and about fifteen feet past the beginning of Lot 1. The tree was approximately fifteen to nineteen years old and was planted by the Favreaus in 2010 or 2011 as part of a landscaping project for Lot 4. The Allens still owned Lots 5 and 6, and there were no objections

---

[12] As discussed below, the Nicolases interrupted Fullerton before she could finish completely cutting down the tree, as was her intention. A small stem was left standing. Nevertheless, Fullerton substantially destroyed the tree.

9

to its planting from them or any of the lot owners at the time. At the time Fullerton cut it down, the tree had a caliper diameter of about 9 inches. Its canopy measured 15 feet in diameter, but would allow vehicle traffic beneath it. The tree was in excellent health, thriving in its location, and very attractive. There was room to curve a driveway into the southeasterly corner of Lot 1 without needing to cut down the tree. Fullerton had no legitimate reason to cut down the cherry tree.

About eight feet beyond where the ornamental cherry tree was growing is the large red pine tree. The tree is big, measuring 16 inches in diameter at breast height ("DBH"). The tree is handsome, standing approximately 40 feet high, with a crown diameter of approximately 16 feet. This is the tree that marks the point beyond which the ROW is not suitable for vehicle traffic or driveway construction, due the slope and presence of ledges. The pine tree does not interfere in any way with constructing a driveway into the southeasterly corner of Lot 1 from in the flat, grassy area of the ROW in front of the pine tree.

Approximately fifteen feet past the pine tree was a beautiful, ornamental weeping cherry tree (Prunus sub. pendula.). This is another one of the four trees cut down by Fullerton. The tree was approximately eighteen years old and was also planted by the Favreaus in 2010 or 2011 as part of a landscaping project for Lot 4. None of the lot owners objected to its planting. At the time Fullerton cut it down, the tree had a caliper diameter of about 6 inches. The tree had a crown diameter of approximately 12 feet. The tree was in excellent health, thriving in its location, and very attractive. The tree did not interfere in any way with constructing a driveway into the southeasterly corner of Lot 1 from in the flat, grassy area of the ROW in front of the pine tree. Fullerton had no legitimate reason to cut down the tree.

Approximately fifteen feet past the first weeping cherry was another beautiful, ornamental weeping cherry tree (Prunus sub. pendula). This is last of the four trees cut down by Fullerton.

10

Like its nearby twin, the tree was also approximately eighteen years old, and was also planted by the Favreaus in 2010 or 2011 as part of their landscaping project. Similarly, there were no objections to its planting. It had a caliper diameter of about 8 inches. The tree had a crown diameter of approximately 12 feet. The tree was in excellent health, thriving in its location, and very attractive. The tree did not interfere in any way with constructing a driveway into the southeasterly corner of Lot 1 from in the flat, grassy area of the ROW in front of the pine tree. Fullerton had no legitimate reason to cut down the tree.

Proceeding past the ornamental trees in the direction of Merriconeag Sound, four ornamental, medium size spruce trees (each approximately 6 inches DBH) were planted long ago in the center or left of center in the ROW. There were no objections to their planting. Each of the trees is in good health and thriving. None of the spruce trees individually or collectively interfere with walking along the ROW. The tree did not interfere in any way with constructing a driveway into the southeasterly corner of Lot 1.

Despite the trees and granite light post, the portion of the ROW before the pine tree is accessible by both foot and vehicle. Fullerton has walked the full length of the ROW, even at night with the aid of a flashlight

## IV. Cutting Trees in the Right-of-Way and Trespass

The Fullertons, through Prime and Kinderhaus respectively, purchased Lots 1 and 2 in April 2018[13] with the intent of retaining Lot 2 and "flipping" Lot 1. On behalf of her own property, Fullerton intended to impose building restrictions on Lot 1 to preserve the views of Merriconeag Sound from Lot 5. To prepare Lot 1 for sale, increase its marketability, but also protect her views,

---

[13] The is the same month the Nicolases closed on Lot 4. The week before the closing, the Nicolases learned Lots 1 and 2 were available. The day after they closed on Lot 4, the Nicolases submitted an offer on Lots 1 and 2, but the offer was not accepted. As described above, the Fullertons, acting through their LLCs, purchased Lots 1 and 2.

Fullerton, planned to provide water to Lot 1 by having a well drilled just inside the boundary of Lot 1, but down near the terminus of the ROW at Merriconeag Sound.[14] In order to provide access for the well driller, and to serve as vehicle access for Lot 1, Fullerton planned to extend the existing driveway in the ROW, with a paved or gravel travel way centered within the ROW, all the way down the slope and ledges to or near Merriconeag Sound.[15] The driveway would enter Lot 1 from the ROW at some point down the slope and between the spruces, in the vicinity of the proposed well. In furtherance of her plan, Fullerton intended to remove all the trees in the ROW.

In May 2018, communicating with the Nicolases through a realtor, Fullerton announced her plan to construct a driveway in the ROW and remove the granite light post and all the trees. In response, the Nicolases obtained a legal opinion. Also communicating through a realtor, the Nicolases let Fullerton know that they did not consent to construction of a driveway in the ROW, or removal of the trees, but that they were willing to "figure out a solution" that would satisfy everyone's needs. Thereafter, both sides engaged lawyers to advocate for their respective positions.

Fullerton, however, pressed forward with her plans for Lot 1. On behalf of Prime, Fullerton hired a well driller and entered into a contract with a contractor to build the driveway. Fullerton scheduled the well driller for the week of July 9, 2018 and notified the Nicolases of her plan to remove the trees and granite light post. She also offered to allow the Nicolases to remove these fixtures themselves. In response, the Nicolases gave Fullerton a Title 32 M.R.S. § 3033 Notice

---

[14] The Court notes that the selected well location is likely not possible due to the desired site being too close to Lot 4's septic leach field. In selecting a location for the well, Fullerton merely estimated the location of Lot 4's leach field, she did not actually verify the location, distances, or feasibility of properly drilling the well in the chosen location.

[15] Apart from this general sense of where Fullerton wanted the driveway for Lot 1 to be built, she did not obtain any specific plan or sketch for the driveway, and she had no specific plan or sketch for where a house would or could be located on Lot 1. She did not have an actual plan for the driveway prepared. She did not investigate whether she could route the travel way around the trees. Fullerton thus undertook to cut all the trees in the ROW based merely on her general intentions, and without exploring any alternative to mitigate destroying all the trees.

informing the Fullerton that they were seeking to have the easement rights vacated. The Nicolases did not remove the trees or the granite light post.

Unwilling to wait for the attorneys to work out the legal issues, Fullerton purchased a chainsaw and took matters into her own hands, literally. On or about June 28, 2018, unbeknownst to the Nicolases, Fullerton drove onto the ROW and parked her SUV straddling the boundary between Lots 4 and 5. She took out her chainsaw, walked onto the Lot 4 portion of the ROW, and proceeded to cut down and remove the native cherry tree and the two weeping cherry trees leaving only stumps a few inches off the ground where the once thriving trees stood.[16] Fullerton started with cutting these trees, because she viewed them as comparatively manageable, and she wanted to gain experience with the chainsaw before she felled the larger trees in the ROW. Fullerton is not an arborist or a forester, and had no experience operating a chainsaw or felling trees. She did not consult with an arborist or forester about felling or relocating and transplanting the trees.

The next day, June 29, 2018, Fullerton returned to the ROW to resume her chainsaw work. She cut down the main stem of the juniper bush, which included the portion of canopy that was growing into the ROW. She did not consult an arborist about how, whether or where to make pruning cuts, or how much of the tree to remove. She intended to remove all of the tree. However, while Fullerton was cutting the juniper with her chainsaw, the Nicolases arrived at their property and discovered her in the act. It was between 4:00 p.m. and 6:00 p.m. in the afternoon, and the Nicolases had just arrived after a long drive from Virginia. Because Fullerton was interrupted, she did not have time to cut down the entire tree. The tree was mostly destroyed, although a small stem of juniper was left standing, leaving the tree unbalanced and lopsided.

---

[16] Fullerton used a contractor to haul the debris away.

In cutting down the trees, Fullerton was acting on behalf of Prime, as an agent of Prime, and on her own behalf. She wanted to ensure Lot 1 was developed in a manner calculated to preserve the views from her Lot 5.

The Nicolases were stunned to discover Fullerton operating a chainsaw on their property. This was the first time Karl Nicolas had met Fullerton, but he knew who she was because of the New Jersey license plate on her vehicle. Fullerton's vehicle was partly blocking the Nicolases' driveway. Apart from gloves, Fullerton was not wearing safety equipment such as a hardhat, safety glasses, chainsaw chaps, or steel toed boots.[17] Karl asked Fullerton "why are you doing this, we're trying to work it out." Fullerton responded in a very hostile manner. She yelled at the Nicolases and called Karl an "idiot." She also made snide comments, saying to the Nicolases "you can thank me" for cleaning up the debris. She was very agitated throughout the incident. The Nicolases asked Fullerton to leave, which she did after placing her chainsaw in the back of her vehicle. The Nicolases were very disturbed by the incident, and even felt compelled to call the police.[18]

This was not the first time Fullerton had entered onto the Nicolases property without their permission. In April 2018, the Nicolases' security cameras recorded Fullerton entering onto the Nicolases' property, and walking around their pool, house, and dock.[19] The Nicolases were not present at the time, and Fullerton had no legitimate reason for entering onto and walking around their property. Because she had no reason to be there, Fullerton was acting on her own behalf, not on behalf of Prime or Kinderhaus. Nor is Fullerton the only member of her family to invade the Nicolases property without permission. The Nicolases security cameras also recorded Fullerton's adult son hanging out at the Nicolases' pool, smoking a cigarette.

---

[17] Fullerton was wearing a short-sleeved T-shirt, jeans, and running shoes.
[18] Apart from talking with Fullerton, the police took no action, and no charges were filed.
[19] The security video was not played at trial, but the testimony was undisputed.

In July 2018, when Fullerton cut down the Nicolases' trees, all four trees were alive and thriving. Fullerton did not have the Nicolases' permission to cut down the trees. Without waiting for the attorneys to work through the legal issues, Fullerton intentionally and knowingly cut down the trees. All of the trees were ornamental trees. The cost to replace the trees Fullerton cut down with trees of comparable size and the same or equivalent species are as follows:[20] Juniper - $650.00; 9-inch Prunus virginiana (the native cherry) - $10,000.00; 6-inch Prunus sub pendula (weeping cherry)- $6,700.00; and 8-inch Prunus sub pendula (weeping cherry) - $10,000.00. Transporting the trees, in two loads to ensure tree viability, would cost $10,000.00 in total or $2,500.00 per tree. The labor and machinery required to unload and plant the four trees would cost $8,250.00 in total or $2,062.50 per tree. In total, to replace, replant, and restore all four trees with trees of comparable size and the same or equivalent species would be $45,600.[21]

## CONCLUSIONS OF LAW

The legal issues to be decided in this case have to do with the scope of the ROW, on the one hand, and trespass on the other hand. Determining the scope of the easement is a necessary predicate to deciding the trespass issues. Thus, the scope question will be taken up first, followed by a discussion of timber and common law trespass.

**I.      Scope of the ROW**

---

[20] The Court credits and is persuaded by the expert reports and testimony offered by the Nicolases regarding the trees, including replacement and related costs. The Court was unpersuaded by the testimony of the expert called by the Fullertons.

[21] These costs reflect prices as of 2020. In 2019, the total replacement costs were $41,050.00, composed as follows: Juniper - $550.00; 9-inch Prunus virginiana (native cherry) - $9,000.00; 6-inch Prunus sub pendula (weeping cherry)- $6,000.00; and 8-inch Prunus sub pendula (weeping cherry) - $9,000.00. Transporting the trees, in two loads to ensure tree viability, would cost $9,000.00 in total or $2,250.00 per tree. The labor and machinery required to unload and plant the four trees would cost $7,500.00 in total or $1,875.00 per tree. The increase between 2019 and 2020 represents inflation, caused in part by the pandemic.

Plaintiffs seek a declaratory judgment that they have the right to cut down all the trees in the ROW and construct a lengthy driveway with a gravel or pavement surface, down the center of the ROW all or a significant distance through Lot 4, to provide access to Lot 1. The Nicolases seek a declaration that Plaintiffs may not disturb the soil of the ROW for a driveway of any length, or cut down the trees, because Lot 1 may be accessed by foot and by vehicle through the ROW in its present condition, trees and all. As discussed below, the language of the operative deeds, the intention of the parties to the original conveyance, and the conditions of the ROW on the ground before and after the ROW was created, determine the scope of the ROW and the contours of the resulting declaratory judgment.

a. **Ambiguity in the Deed's Language**

"Whenever an easement[22] exists by grant, it may be enjoyed to the extent of the legitimate meaning of the terms used, but to that it must be confined." *Chandler v. Goodridge*, 23 Me. 78, 84 (1843). The scope of an interest in land conveyed by a deed is properly to be determined solely from the language of the conveyance, provided that the language is clear and unambiguous. *Badger v. Hill*, 404 A.2d 222, 225 (Me. 1979); *see also Sleeper v. Loring*, 2013 ME 112, ¶ 18, 83 A.3d 769 ("[a]s with any other portion of a deed, the scope of a party's easement rights must be determined from the unambiguous language on the face of the deed.")(citation and internal quotation marks omitted). Deeds that plainly describe the width, mode of passage through, and the termination point of a right-of-way may be unambiguous in those regards, but ambiguous in other

---

[22] "A right of way is an easement" *S. E. & H. L. Shepherd Co. v. Shibles*, 100 Me. 314, 318, 61 A. 700, 702 (1905). In Maine, "easement or right-of-way" generally means the right of a person to pass over the land of another person. *See Fissmer v. Smith*, 2019 ME 130, ¶ 45, 214 A.3d 1054 (quoting Easement, Black's Law Dictionary (10th ed. 2014) "An interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose (such as to cross it for access to a public road)."); *Sleeper v. Loring*, 2013 ME 112, ¶ 18 n.5, 83 A.3d 769 (A right-of-way is legally defined as a legal right to pass through property owned by another. See BLACK'S LAW DICTIONARY 1326 (7th ed. 1999)); *see also* 33 M.R.S. § 458, Easements or rights-of-way; installation of utility services; 33 M.R.S.A. § 459, Easements and rights-of-way; installation of docks.

16

critical respects, such as scope. *Badger,* 404 A.2d at 225 (finding a deed that plainly described the width of the right of way, the mode of passage, and the terminus to be unambiguous in respect to basic elements, but ambiguous in respect to the full scope of the use or purpose.) When a deed is silent as to the purpose of a right of way, "the deed may be unambiguous so far as it goes, but it does not go far enough in respects that are critical to the evaluation of the full scope, contemplated by the parties, of the use to be made of the right of way." *Id.*; *see also Flaherty v. Muther,* 2011 ME 32, ¶ 56, 17 A.3d 640.

Here, the location, length, and width of the ROW is clearly defined in the deeds and depicted on the Plan. Based on the language of the deeds, the court previously determined Lots 1 and 2 have express, deeded easement rights in the ROW for "vehicular as well as foot traffic."[23] The deed language, however, is silent as to the purpose and scope of the ROW regarding vehicles, and the Court did not previously address these issues. The deed language does not, for example, address whether the dominant estate can disturb the soil of the ROW in order to construct a driveway, whether the surface can be graveled or paved, where a driveway can be located within the ROW, whether a driveway can extend the entire length and width of the ROW across Lot 4, and related questions. Accordingly, as to vehicle use, the purpose and scope of the deed language is ambiguous.

When the purpose of an express easement is not clear, the court must "ascertain the objectively manifested intention of the parties to the original conveyance in light of circumstances in existence recently prior to the execution of the conveyance, as well as use of the easement and acts acquiesced to during the years shortly after the original grant." *Flaherty v. Muther,* 2011 ME 32, ¶ 55, 17 A.3d 640; *see also Sleeper v. Loring,* 2013 ME 112, ¶ 20, 83 A.3d 769. A court may

---

[23] And Lots 5 and 6 have foot traffic rights over the ROW.

17

consider evidence of extrinsic circumstances as an aid to determine the parties' intent and the scope of the easement rights. *Fine Line v. Blake*, 677 A.2d 1061, 1064 (Me. 1996) (citing *N. Utils., Inc. v. S. Portland*, 536 A.2d 1116, 1117 (Me. 1988)); *Badger*, 404 A.2d at 225 (citing *Gillespie v. Worcester, Me.*, 322 A.2d 93, 95 (1974)).

### b. Guiding Principles

The scope of a grantee's rights to use an easement is not limitless and the full scope of the use to be made of the right of way requires evaluation of the purpose it was intended to serve at the time of conveyance. *See Fissmer v. Smith,* 2019 ME 130, ¶ 45, 214 A.3d 1054 (finding the scope of easement rights for passage along recorded planned roads in a subdivision did not include the right to build driveways or other such similar activities normally associated with land ownership in the easement because such uses were outside the intended limited purpose of mere passage over the land); *Badger v. Hill*, 404 A.2d 222, 225 (Me. 1979); *Guild v. Hinman*, 1997 1997 ME 120, ¶¶ 7-8, 695 A.2d 1190 ; *Fine Line, Inc. v. Blake*, 677 A.2d 1061, 1064-65 (Me. 1996) (holding that even a ROW 'for all purposes' does not automatically include the right to install utility lines and remanding the case so that the trial court may determine the original parties' intended purpose for the ROW.); *see also Kaler v. Beaman,* 49 Me. 207 (1860) (since deed granted the free and unobstructed use of the easement for the limited purpose of allowing grantee passage to his mill from the highway, all other activities, like storing lumber on the easement, were outside the scope); *Alderette v. Grant*, Re-14-83, 2018 Me. Super. LEXIS 57 (April 20, 2018) (use of the easement was limited because it was not intended to be used as a road or storage).

A dominant estate owner may not use an easement to access property, or portions of a property, that the parties to the conveyance did not originally contemplate would be served by the easement. *See Flaherty v. Muther*, 2011 ME 32, ¶ 74, 17 A.3d 640. When determining the scope

18

of an easement, with its purpose in mind, the question is whether a particular use would have been within the contemplation of the parties to the original conveyance or reasonably foreseeable at the time of the grant. *Wardwell v. Duggins*, 2016 ME 55, ¶ 12, 136 A.3d 703 (citing to *Guild*, 1997 ME 120, ¶¶ 7-8, 695 A.2d 1190 and *Pettee v. Young*, 2001 ME 156, ¶ 15, 783 A.2d 637); *Badger v. Hill*, 404 A.2d 222, 226 (Me. 1979) (finding the purpose of an easement to a river included the right to build a dock because a dock was contemplated at the time of conveyance). Extrinsic evidence, such as "circumstances in existence recently prior to the execution of the conveyance, as well as use of the easement and acts acquiesced to during the years shortly after the original grant" may be considered when assessing if a particular use was reasonably foreseeable. *Wardwell v. Duggins*, 2016 ME 55, ¶ 12, 136 A.3d 703 (quoting *Sleeper v. Loring*, 2013 ME 112, ¶ 20, 83 A.3d 769); *see Badger,* 404 A.2d 222, 226 (finding testimonial evidence that original grantor and grantees toured the planned easement to determine where it ended in case the grantees wished to build a dock in the future was sufficient for a finding that a dock was within the scope of the easement). The original site plan showing rights-of-way may be used as evidence of the parties' intent. *See Rancourt v. Town of Glenburn*, 635 A.2d 964, 965 (Me. 1993).

Generally, "where the metes and bounds of an easement are explicitly described in the deed, the easement holder has the right to use the full extent of the described land for purposes consistent with the deeded easement." *Mill Pond Condo. Ass'n v. Manalio*, 2006 ME 135, ¶ 7, 910 A.2d 392. "If a grant expressly details its specific boundaries . . . the owner of the right of way is entitled to use the entire granted area, and is not limited to what is necessary or convenient." *Stanton v. Strong*, 2012 ME 48, ¶ 10, 40 A.3d 1013 (quoting *Mill Pond Condo. Ass'n v. Manalio*, 2006 ME 135, ¶ 6, 910 A.2d 392) (internal quotations omitted). Further, "where the grant of an easement is clearly for the purpose of allowing free and convenient passage over a lot from every

feasible point necessary for enjoyment of the easement, restriction of access to a particular point is impermissible." *Mill Pond Condo. Ass'n*, 2006 ME 135, ¶ 6, 910 A.2d 392. (citing *Cleaves v. Braman*, 103 Me. 154, 161, 68 A. 857, 860 (1907)) (emphasis added).

Despite these general rules, a grantee's use of the easement is nevertheless limited to a reasonable use within the scope of their rights. *Guild v. Hinman*, 1997 ME 120, ¶ 6, 695 A.2d 1190 (holding the reasonable use of a right-of-way is not limitless and is guided by the scope); *see Kaler,* 49 Me. at 208-09 (when exercising their rights, grantees may not unnecessarily, by wantonness or negligence, injure the servient estate)*; Cleaves, 103 Me. at 160, 68 A. at 859* (grantees may exercise their rights in a reasonably convenient manner to accomplish the purpose of the easement); *Morissette v. Somes*, 2001 ME 152, ¶ 10, 782 A.2d 764 (the reasonableness of improvements or repairs made by the owner of the dominant estate on an easement for a right of way is a question of fact for the trial court)(citation omitted); *Beckwith v. Rossi,* 157 Me. 532, 536, 175 A.2d 732, 735 (1961) ("The reasonable use and enjoyment of an easement is to be determined in the light of the situation of the property and the surrounding circumstances."); *Ware v. Pub. Serv. Co.*, 412 A.2d 84, 86 (Me. 1980) ("grantee of an easement, although restricted in his enjoyment of the right to the extent of the legitimate meaning of the grant, may take any action reasonably necessary to insure the full enjoyment of the right")*; see also Gendron v. Central Maine Power Company,* Me., 379 A.2d 1002, 1005 (1977) and *Perkins v. Perkins*, 158 Me. 345, 184 A.2d 678 (1962)). If an easement is used in a manner outside the scope of the easement, that use is an overburden on the dominant estate.[24]

---

[24] If a party contends that the use would be inconsistent with an easement's original purpose, as the Nicolases here assert, the trial court must evaluate whether, in the context of the uses contemplated by the original parties, the challenged use will overburden the servient estate. *See Sleeper*, 2013 ME 112, ¶ 21, 83 A.3d 769; *Flaherty*, 2011 ME 32, ¶ 74, 17 A.3d 640. The analysis of whether a use is an overburden is the same as the analysis to determine if the use is within the scope of the easement. *Laux v. Harrington*, 2012 ME 18, ¶ 29, 38 A.3d 318; *Flaherty*, 2011 ME 32, ¶ 74, 17 A.3d 640 ("The court's overburdening analysis evaluate[s] whether it is reasonable to conclude that a particular use was within the contemplation of the parties to the conveyance and, in that context, whether the contested

The owner of the servient estate generally retains all rights to the soil and use not inconsistent with the grantee's paramount rights. *Kaler*, 49 Me. at 208.; *see also Chandler v. Goodridge, 23 Me. 78, 82 (1843) (*"by the location of a way over the land of any person, the public have acquired an easement, which the owner of the land cannot extinguish or interrupt; but the soil and freehold remain in the owner, although encumbered by the way")(citation omitted); *see also Littlefield v. Hubbard*, 120 Me. 226, 230, 113 A. 304, 306 (1921) ("Whatever the defendant's right of passage over the way, if any, she had no right to build a concrete walk or otherwise disturb the soil upon the fee of the plaintiff."). "[A]n easement for a right of way, without more, does not permit the grantee to 'disturb the soil upon the fee' of the owner of the servient estate." *Davis v. Bruk*, 411 A.2d 660, 666 (Me. 1980). In *Davis v. Bruk*, the Court determined that disturbing the soil in order to pave the way was unreasonable, exceeded the scope of the easement, and thus overburdened the servient estate. *Id.*[25]

No party has a right to unilaterally alter the location or scope of an easement, unless such a right is reserved or granted in the deed. *Id. at 664.* However, if part of an easement has had its soil developed by changing the grade or scheme to create a more convenient passage over part of the easement, then an extension matching the grade or scheme may be constructed as long as the expansion is still within the scope of the easement and reasonable under the circumstances. *See*

---

use made of the servient estate by the dominant estate exceeds the rights granted to the user." quoting *Poire v. Manchester*, 506 A.2d 1160, 1163 (Me. 1986)). Whether a use is an overburden is a question of fact. *Laux*, 2012 ME 18, ¶ 29, 38 A.3d 318

[25] The Court notes that trial courts have had divergent views on the validity of *Davis* and *Littlefield*. In *Halling v. Moynihan*, the York Superior Court (*Fritzsche, J.*) observed "*Littlefield* was based on *Burr v. Stevens*, 90 Me. 500, 38 A. 547 (1897). It appears that the 1921 *Littlefield* doctrine which was used to prohibit the paving of the driveway in 1980 arose in a case from 1897 where the defendant may not have had an easement at all. The *Burr* case may more properly be limited to highways where private citizens cannot make alterations." *Halling v. Moynihan* No. CV-950438, 1996 Me. Super. LEXIS 176, at *4 (June 19, 1996). *But see Alderette*, 2018 Me. Super. LEXIS 57 (citing *Davis and* quoting *Littlefield* to support a finding that the scope of the 10-foot-wide easement did not include the right to disturb the soil because the evidence suggested it was meant to merely be a pass for ingress and egress by foot and vehicles that would not damage the property.)

*Rotch v. Livingston,* 91 Me. 461, 40 A. 426 (1898) (holding that a grantee may widen a road because widening the road was within the scope of the easement; the expansion could be constructed to match the existing road's properties.) The ultimate question is whether the proposed or disputed use of the easement is reasonable to achieve the purpose of the easement without exceeding the scope (thus overburdening it).

Based upon the evidence presented to the Court, the objectively manifested intentions of the parties to the original conveyance, and circumstances shortly before and after the easement was created, the Court declares the scope of the ROW as follows.

1.  **The ROW was intended to provide driveway access to Lots 1, 2 and 4, and the surface of the driveways may be paved or graveled, but the driveway for Lot 1 cannot extend past the red pine tree.**

It is evident that the ROW was created with the intent and for the purpose of providing driveway access to Lots 1 and 4, and optional driveway access for Lot 2.[26] After creating the subdivision and selling Lots 1, 2 and 4 according the Plan, the original grantor, Bruce Allen, ensured the purchasers were granted a right to use Abner Point Road. In recognition of that right and convenience, Allen created the ROW to provide vehicle access from Abner Point Road to Lots 1, 2 and 4. Lots 1 and 4, in particular, have no other access to Abner Point Road. In order to ensure Lot 5 could not prevent Lots 1, 2 and 4 from building a driveway over the ROW connecting to Abner Point Road, there is a building restriction on the portion of Lot 5 through which the ROW runs.

The original intent to have the ROW serve as driveway access is further evidenced by the layout of the ROW within the Abner Point Subdivision. The ROW terminates at Merriconeag

---

[26] It follows that parking in the ROW is impermissible, except briefly as necessary to support maintenance and servicing of the ROW and adjacent properties. When brief parking is necessary, the driver of the vehicle should pull to the side of the ROW, if possible, to allow other vehicles to pass by. The driver of the parked vehicle must always remain with or near the vehicle, so that the parked vehicle can be promptly moved as necessary or upon request.

22

Sound; there is no through passage for vehicles beyond that point. There is a 10-foot-wide walking easement that follows along the shore of Lot 1, but that walking easement does not permit vehicle traffic. Thus, there is no place for vehicles using the ROW to go, other than to Lots 1, 2 and 4. Moreover, the terminus of the ROW is not wide enough to reasonably accommodate a turn-around or a cul-de-sac. If a vehicle were to drive all the way to the end of the ROW at Merriconeag Sound, it would need to back all the way out. Vehicle use of the ROW for driveway access to Lots 1, 2, and 4 is the only purpose that makes objective sense. The ROW was not intended as a dead-end road to allow *vehicles* to drive all the way to the edge of Merriconeag Sound. That is why the ROW provides *walking* access all the way along its length, right up to the Sound.

The evidence also establishes that intent was for the ROW to serve as a driveway for a single point of vehicle entrance into each lot. Lots 1, 2 and 4 are limited to residential use and a single residential dwelling on each lot. The lots cannot be used for commercial, business, or livestock activities, which might necessitate multiple points of vehicle entry into each lot from the ROW. Thus, this is not a situation where the grantor intended free and convenient vehicle passage into each lot from every feasible point along the ROW. Indeed, when the Allens were still living in the area, multiple ornamental trees were planted in the ROW starting near the big red pine tree where the ROW begins to slope steeply downward, manifesting an intent to disallow use of the lower portion of the ROW for vehicle driveway access into Lot 1. No lot owners objected, and indeed all lot owners at the time acquiesced to the trees being planted in the ROW. Indeed, vehicles have never regularly used the lower portion of the ROW past the pine tree. There is only one driveway from the ROW into Lot 4, and this is the intended model for Lots 1 and 2.

Moreover, the Court finds that the parties to the original conveyance could not reasonably have intended that the entire length of the ROW should be used as a driveway or accessible to

23

residential vehicles. The ROW topography has not been altered since the Allens created the easement. The slope and ledges in the ROW make the ROW unsuitable for vehicle or driveway use in the stretch beginning at the red pine and proceeding to Merriconeag Sound. It is no accident that the Allens placed the southeasterly boundary of Lot 1 with enough space to accommodate a driveway connecting to the ROW on the flat section of the ROW in front of the big pine tree. Therefore, it is a reasonable conclusion that the parties to the original conveyance understood that the ROW's topography would act as a natural limiting element to vehicular traffic and intended vehicle traffic for the driveway into Lot 1 to stop in the flat area just before the red pine. It was not reasonably foreseeable that the stretch of the ROW past the red pine tree would be used for vehicle traffic. Altering the surface and subsurface of the ROW to accommodate safe vehicle traffic for a driveway extending past the red pine would unreasonably burden the servient estate. The right of Lots 1 and 2 to use the ROW for vehicle traffic does not extend past the red pine.[27]

The Allens made the ROW 20 feet wide, but they did not intend that all 20 feet of the width should be used for vehicle traffic, or even necessarily the centerline of the ROW. The ROW is 20 feet wide for several reasons. First, the ROW is simultaneously intended for foot traffic along with vehicle use. A 20-foot-wide ROW accommodates a pedestrian walking along-side a driveway used by vehicles, with sufficient space to avoid a safety hazard. Second, a driveway can be located within the ROW in such a fashion as to accommodate objects in the ROW, while still allowing vehicles to pass. Long before the Nicolases purchased Lot 4, there was no objection to the owners of Lot 4 placing a granite light post in the ROW just right of center, because vehicles could pass to the left of the post. Similarly, driveways into the lots could be flared out to accommodate turn

---

[27] The determination that vehicular rights do not extend past the red pine also prevents overburdening of Lot 4 by negating the Nicolases' concerns about Plaintiffs and their guests speeding past the pine into their backyard/lawn area or disturbing the shoreline.

radius as necessary. The driveway into Lot 4 is 10 feet wide, but it is wider at the point that the driveway intersects with Abner Point Road in Lot 5. Finally, Lots 1, 2, and 4 are restricted to residential use. A 10-foot-wide driveway is appropriate to serve residential lots, as illustrated by the driveway into Lot 4, and the grantor could not reasonably have intended for any such driveway to take up the entire width of the ROW, or to be located in such a fashion as to prohibit the servient estate for any other use of the land in the ROW. A driveway any wider would be unreasonable given the intent and circumstances of the properties and would thus constitute an overburden on Lot 4.[28]

The Allens, in creating and conveying the ROW, intended that the surface of the driveways into Lots 1, 2 and 4 could be gravel or pavement. The driveways into Lots 6 and 4 are paved, as is Abner Point Road up to and just past the boundary of Lot 2, after which it becomes gravel. The surface of the ROW from Abner Point Road to the corner of Lot 1 in front of the red pine is flat and grassy. A gravel or paved driveway can be easily constructed in this area without overburdening Lot 4. The stretch of the ROW leading to Lot 4 is already paved. A short extension of the grade and paved surface will not change the nature or use of the ROW, fits comfortably within the objectively manifested intent of the parties to the original conveyance, and serves the intended purpose of the ROW. Therefore, the owners of Lots 1 and 2, at their own expense, may construct a paved or gravel 10-foot-wide driveway that naturally continues the existing driveway to the left of the granite post, to a single point of entry into Lot 2 at any feasible point along the

---

[28] Plaintiffs argue that because they were granted rights to the entire ROW that they have the right to pave the entire ROW. Upon review of the case law, the court finds this argument to be in error. Only when an easement is created for the purpose of a road does the scope of the rights include the right to pave the entire easement to make a road. *See Rotch v. Livingston,* 91 Me. 461, 474, 40 A. 426, 432 (1898) ("If the grant is of the right to use the whole of a specified width of land *for a road* it follows logically, in the absence of restrictive words in the grant, that the grantee can fit the entire width for use. His right to *make a road* is as wide as his right to a road so far as width of road is concerned.")(emphasis added). The ROW is not a road, and it was not intended to serve as a road. Had the Allens intended for the ROW to be a road, they would have designated it as such on the Plan. Therefore, Plaintiffs do not have the right to pave the entirety of the ROW.

ROW, and a single point of entry into the southeasterly corner of Lot 1 in the flat area before the red pine.[29] The driveway cannot extend past that point. Appendix 2 illustrates the approximate permissible location of the driveway into Lot 1.[30] This configuration will allow Lots 1 and 2 to have sufficient vehicular access for everyday travel and land development as intended by the Allens. A similar driveway can be located from the ROW into Lot 2. The driveway into Lot 4 can remain as it currently exists and be maintained over time.

To facilitate Plaintiffs' reasonable use of the ROW consistent with its scope and for its intended purpose as described above, the Nicolases' granite light post must be relocated no less than three feet to the right (toward Lot 4). As discussed above, the current location of the granite post is acceptable for occasional vehicle use of the ROW by contractors and landscapers. However, the post is too close to permit safe, regular use of the ROW by vehicles passing over a driveway to Lots 1 and 2. Pedestrians need to be able to walk to the side of the driveway, and the owners of Lots 1 and 2 need to be able to provide for snowplowing and other maintenance activities without unreasonable interference from the granite post. Relocating the granite post at least three feet to the right provides the dominant estates with full use of the ROW consistent with its scope and for its intended purpose, without overburdening the servient estate.

**2. The ROW was also intended to provide walking water access to the Sound.**

The ROW's second purpose is to provide Lots 1, 2, 5, and 6 with walking access to Merriconeag Sound. Had the Allens intended to limit use of the ROW to a driveway for vehicle traffic, they would have terminated the ROW in the flat area near the southeasterly corner of Lot

---

[29] If Prime desires to construct a driveway to accommodate vehicle traffic to the northeasterly corner of Lot 1, Prime can construct said driveway on its own land within the boundaries of Lot 1.

[30] If the illustration contained in Appendix 2 is not sufficient for the parties to agree upon the precise location of where the driveway can be built in the ROW, or if the parties need an officially sanctioned metes and bounds description of the permissible driveway location, any party can petition for supplemental relief pursuant to 14 M.R.S. § 5960 or move for relief under M.R. Civ. P. 60(b). *See, e.g. Testa'S, Inc. v. Coopersmith*, 2015 Me. Bus. & Consumer LEXIS 46 (July 2, 2015)(*Horton, J.*).

1, and failed to grant walking rights to Lots 1, 2, 5 and 6. Further, the ROW connects to the ten-foot walking easement in common along the shoreline of Lot 1, so it is reasonable to conclude the ROW provides walking access to the walking right-of-way through Lot 1.[31]

The existence of this second purpose undermines Plaintiffs' argument that if they are not permitted to construct a paved or gravel driveway over the full length and width of the ROW, they will be unreasonably deprived of the full use of the ROW. Not so. Even though Plaintiffs are not permitted to construct a driveway to operate vehicles over the entire ROW, they will still be able to walk the full length and width of the ROW. Thus, as the parties to the original conveyance intended, Plaintiffs have full, reasonable use of the ROW that is consistent with its purpose and scope.

## II. Trespass

The Nicolases seek damages for both timber trespass and common law trespass. The Court addresses the claim for timber trespass first.

### Timber Trespass

Under Maine law, a person may not "[c]ut down, destroy, damage or carry away any . . . ornamental . . . tree . . . from land not that person's own" without permission of the owner. 14 M.R.S. §7552(2)(A). Violation of the law is referred to as a "timber trespass." *See Bray v. Grindle,* 2002 ME 130, ¶ 11, 802 A.2d 1004 ("Pursuant to the timber trespass statute, 14 M.R.S.A. § 7552…"); *Dionne v. LeClerc*, 2006 ME 34, ¶ 3, 896 A.2d 923 ("statutory timber trespass damages pursuant to 14 M.R.S. §§ 7552 and 7552-A…"). If the lost trees are ornamental, the owner may

---

[31] Grantees are limited to using the width of ROW 1 to access the Sound. They should take care not to stray outside of the ROW onto portions of Lot 4 where they have no usage rights. Such wandering would be outside the scope of their easement rights.

pursue damages for "the costs of replacing, replanting and restoring the trees with trees of comparable size and the same or equivalent species and the actual costs for cleanup of damage caused during the cutting." 14 M.R.S. §7552(3)(B)(4). Additionally, "[a] person who intentionally or knowingly violates" the prohibition against timber trespass "is liable to the owner for 3 times the owner's damages" or $500, whichever is greater. 14 M.R.S. § 7552(4)(B). "A person who with malice violates" the prohibition is also subject to punitive damages. 14 M.R.S. § 7552(4)(B). An award of punitive damages must be supported "by clear and convincing evidence that the defendant's conduct was motivated by actual ill will or was so outrageous that malice is implied." *Fine Line v. Blake*, 677 A.2d 1061, 1065 (Me. 1996). Finally, the owner may additionally recover interest, costs, and attorney fees, and so long as the perpetrator has written or actual notice that a claim is being asserted, expert costs and fees. 14 M.R.S. § 7552(5).[32]

Here, Fullerton was acting in part on behalf of Prime, and no party has disputed that she was acting within the scope of her duties as the Manager of Prime. She both authorized and committed the trespass, and both she and Prime are liable for her actions. *See Martin v. Brown*, 650 A.2d 937, 939 (Me. 1994); *Bonk v. McPherson*, 605 A.2d 74, 78 (Me. 1992). But Fullerton was also acting on her own behalf, because where she intended to locate the driveway onto Lot 1 was driven in part by her desire to protect her views from Lot 5. Accordingly, Prime and Fullerton are joint and severally liable for the damages related to the cutting of any tree that did not interfere with their easement rights in the ROW, since removing trees that did not need to be removed constitutes an act exceeding Prime and Fullerton's easement rights.

---

[32] An offer of settlement made 10 days before trial might preclude recovery of interest, costs, and fees, 14 M.R.S. § 7552(6), but there is no evidence that such an offer was made in this case.

28

As described above, none of the four trees needed to be cut down and destroyed. The canopy of the juniper tree grew into the ROW, but vehicle traffic and walkers could still easily pass by on the left of the tree. To the extent additional space was required to allow both vehicles and walkers to pass by, the tree could have been carefully and professionally been pruned back rather than destroyed. The native cherry tree posed no interference with reasonable use of the ROW, as there was sufficient space in front of the tree to locate a driveway into the southeasterly corner of Lot 1. Fullerton never even considered transplanting the cherry tree to a different location. The two weeping cherry trees presented no obstacle to reasonable use of the ROW within its scope, as described above, and thus Fullerton had no reason to cut down the two weeping cherry trees. As consequence, Fullerton, personally and on behalf of and as an agent of Prime, committed timber trespass with respect to all four trees.[33]

It is beyond dispute that Fullerton intentionally cut down, destroyed, and carried away four ornamental trees in the ROW. That alone is sufficient to award triple damages under the statute. But she also did so knowingly. For an act to be considered "knowing" within the meaning of the timber trespass statute, "the defendant must be subjectively aware that the cutting is improperly taking place on another's land." *Bonk*, 605 A.2d at 77. Here, the evidence establishes that Fullerton was subjectively aware she was improperly cutting the trees on the Nicholases' land. She knew the Nicholases disputed her right to cut down the trees. *See Grant v. Warren Bros. Co.*, 405 A.2d 213, 220 (Me. 1979) (defendant on notice about the dispute). She refused to wait for the legal process to unfold. She did not consult with an arborist or forester about relocating the trees. She

---

[33] The Nicholases can replant the weeping cherries (or their equivalent) in the approximate location of the stumps. The Nicholases can also replant the native cherry and the juniper, but in order to avoid tensions and disputes, not until after the driveway into Lot 1 has been built consistent with this judgment, and then in the approximate location of the stumps but no closer to the driveway than 4 feet. The Nicholases must prevent any tree canopy that develops from interfering with reasonable use of the driveway.

attempted to cut the trees down while the Nicolases were not present. In sum, Fullerton intentionally and knowingly violated the statute.

Fullerton's conduct was utterly outrageous and motivated by ill will. In our society, resorting to self-help with a chainsaw is not an acceptable method of dispute resolution. Fullerton knew the Nicolases opposed her plan to cut down trees and construct a driveway down the length of the ROW. The Nicolases were trying to work out the issues through the legal process, and both sides had engaged attorneys. The Nicolases, through their attorney, had served a notice on Fullerton of their intent to use legal means to terminate the ROW. Unwilling to let the legal process run its course and delay her plans, Fullerton responded by buying a chainsaw and cutting down four beautiful ornamental trees that did not need to be cut down. Fullerton's conduct exceeded all bounds of civilized society. It demonstrated a flagrant distain and disregard for the Nicolases, their property rights, and the rule of law. Her conduct reflected malice, actual and implied.

Her conduct is especially wanton because she has no training in how to operate a chainsaw or how to fell a tree. Fullerton is not an arborist or forester, nor she did consult with an arborist or forester about removing or transplanting the trees. She treated cutting down the four trees as a warm-up for eventually cutting down the larger trees in the ROW. Operating a chainsaw to fell trees is a notoriously dangerous activity, even for professionals. According to the Centers for Disease Control, "[e]ach year, approximately 36,000 people are treated in hospital emergency departments for injuries from using chain saws." *Preventing Chain Saw Injuries During Tree Removal After a Disaster*, C.D.C. (Oct. 17, 2017) https://www.cdc.gov/disasters/chainsaws.html. Apart from gloves, Fullerton wore no safety equipment while running her chainsaw. Instead, she undertook her work in a tee shirt, jeans, and sneakers. And then, when confronted by the Nicolases on their land, Fullerton was malicious and verbally attacked *them*.

Based on all of the above, the Nicolases are awarded timber trespass damages jointly and severally against Prime and Fullerton as follows. The Nicolases are awarded basic damages of $45,600, which represent the cost of replacing, replanting, and restoring the trees with trees of comparable size and the same or equivalent species. In addition, the Nicolases are awarded $136,800, which is three times the amount of the basic damages, for knowingly and intentionally cutting down the four ornamental trees. As punitive damages for the malicious conduct of Fullerton, the Nicolases are awarded an additional multiplier of two-times the basic damages, which is $91,200. In total, the Nicolases are awarded $273,600 in joint and several damages against Prime and Kinderhaus for timber trespass. The Nicolases are also awarded interest, costs, expert costs and fees, and attorney fees. The Nicolases can submit an affidavit establishing interest, fees, and costs within 30 days of this decision.[34]

Common Law Trespass

Recovery under both the timber trespass statute and common law trespass is not allowed for the same tree damage. *Fuschetti v. Murray*, 2006 ME 100, ¶ 13, 903 A.2d 848. But the analysis of common law trespass does not stop there. A person is liable for common law trespass if she "intentionally enters land in the possession of the other, or causes a thing or a third person to do so." *Medeika v. Watts,* 2008 ME 163, P5, 957 A.2d 980, 982. Damages are not an essential element and nominal damages are "presumed to flow from a legal injury to a real property right." *Id.* (citation omitted). Easement holders that exceed the scope of their easement have committed a trespass and are liable for any damage they cause. *See Gendron,* 1981 Me. Super. LEXIS 87, at

---

[34] The Nicolases have already submitted an interim request for fees and costs through trial in the amount of $28,493.84. The Nicolases must submit any supplemental request within 30 days of this decision. Once the Nicolases have submitted their supplemental request, Plaintiffs will have 21 days to object to any specific entries in the interim or supplemental requests. The Nicolases will have 7 days to file any reply.

*4; *Colquhoun,* 684 A.2d 405, 408 (Me. 1996)*; Cote,* 2018 Me. Super. LEXIS 76, at *14-15*; Kaler*, 49 Me. 207, 209 (1860)("If the defendants in any manner exceeded the above limitations of their rights they would thereby become trespassers, and become liable for so much damage, as they might occasion to the plaintiffs by such excess."); *Beckwith*, 157 Me. 532, 175 A.2d 732 (1961); *Alderette*, 2018 Me. Super. LEXIS 57, at *12-13; *Littlefield,* 120 Me. 226, 113 A. 304 (1921). Punitive damages are available for common law trespass, provided there is clear and convincing evidence of malice, express or implied.

Acting in her personal capacity, in April 2018 Fullerton intentionally and without consent walked onto the Nicolases property in order to snoop around. She walked all around the curtilage of the Nicolases' house while they were not present. Fullerton was not on or even close to the ROW. She had absolutely no purpose in entering upon the Nicolases' property, other than to exercise dominion over the property and satisfy her own illegitimate interests. She had recently outbid the Nicolases for Lots 1 and 2, was making plans to cut down trees and construct a driveway over the ROW, already owned Lots 5 and 6, and acted imperiously as if she owned Lot 4 as well. Her conduct was outrageous and demonstrated contempt for and ill-will toward the Nicolases and their property rights. Her conduct reflected malice, express and implied. Accordingly, the Nicolases are awarded $1 in nominal common law trespass damages, along with $5,000 in punitive damages, against Karen Fullerton personally, along with interest, fees, and costs. This award of damages is in addition to the timber trespass damages described above.

## CONCLUSION

In conclusion, the purpose and scope of the ROW have been declared as described above. The declarations resolve Plaintiffs' Counts II and VII, and the Nicolases' Counterclaim Count II. Judgment is granted in part and denied in part for Plaintiffs and the Nicolases on each of those

32

Counts, as provided herein. A paved or gravel driveway for Lot 1 can be constructed as shown in Appendix 2.

In Count VIII, Plaintiffs seek a permanent injunction. However, Plaintiffs have not shown that the Nicolases will fail to comply with a final judgment resolving this dispute. Accordingly, judgment is granted in favor of the Nicolases on Count VIII of the Complaint.

Additionally, judgment is granted in favor of the Nicolases on Counterclaim Counts IX and X. The Nicolases are awarded damages joint and severally against Prime Properties, LLC and Karen Fullerton for timber trespass in the amount of $273,600, along with interest, costs, expert costs and fees, and attorney fees. The Nicolases are also awarded damages against Karen Fullerton for common law trespass in the amount of $5,001, along with interest and costs. (The common law trespass damages awarded against Karen Fullerton are in addition to, not concurrent with, the timber trespass damages.)

So Ordered.[35]

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Order by reference on the docket for this case.

Dated: **03/03/2022**

_____
Michael A. Duddy
Judge, Business and Consumer Court

Entered on the docket: 03/03/2022

---

[35] With this judgment, all remaining unresolved Counts in the Complaint and Counterclaim have been decided.



PLAN OF ABNER'S POINT
LOTS ON BAILEY ISLAND
HARPSWELL, MAINE
FOR BRUCE ALLEN

SURVEYED BY:
WILLIAM M. COOMBS
REG. LAND SURVEYOR #396

SCALE: 1"=40'     AUGUST 1979

Blumberg No. 5192

EXHIBIT
Joint 1

Appendix 1



MERRICONEAG SOUND

GENERAL NOTES

1. This survey conforms to the standards adopted by the Maine Board of Registration for Land Surveyors with the exception of no new deed description or survey report prepared at this time.

2. Record owners of property surveyed are as follows:
   Lot 1 – Prime Properties ME LLC as described in a deed dated May 14, 2018 recorded in Book 34840, Page 213 at the Cumberland County Registry of Deeds.
   Lot 2 – Kinderhaus North LLC as described in a deed dated May 14, 2018 recorded in Book 34840, Page 215 at the Cumberland County Registry of Deeds.

3. Property surveyed is shown as Lots 38 & 38-1 on Town of Harpswell Property Map 22.

4. Bearings hereon are referenced to magnetic 1979 per plan 5a (see below).

5. Plan/Map references:
   a) Plan of Abner Point Lots on Bailey Island for Bruce Allen by William M. Coombs dated August, 1979 recorded in Plan Book 124, Page 60 at said Registry of Deeds.
   b) Boundary Survey and Lot Division of Property located on Abner Point Road for William B. Hahn by SGC Engineering dated July 20, 2006 recorded in Plan Book 205, Page 456 at said Registry of Deeds.
   c) Standard Boundary Survey of Land of Dorothy P. Chase & Manley O. Chase by Brian Smith Surveying, Inc. dated February 28, 1989 recorded in Plan Book 191, Page 48 at said Registry of Deeds.
   d) Standard Boundary Survey of Land of Marguerite M. Roy for Robert W. Williams Real Estate by MidCoast Survey Co. dated August 18, 1995.
   e) Existing Conditions Survey of Property at 71 Abner Point Road for Karen Fullerton by MidCoast Survey Co. dated August 9, 2016.

LEGEND

| | Boundary line |
| o | Iron pin/pipe found |
| ● | 5/8" iron rod set |
| | Stone wall |
| ep | Edge of pavement |
| -◇- | Utility pole |
| N/F | Now or formerly |
| | Structure |
| | Right of way/easement line |
| ⑥ | Lot no. per plan 5a |
| | Building setback line |

GRAPHIC SCALE

( IN FEET )
1 inch = 20 ft

BOUNDARY RETRACEMENT &
EXISTING CONDITIONS SURVEY
of
LOTS 1 & 2, ABNER'S POINT
Abners Point, Bailey Island, Harpswell, Maine
for
BRIAN & KAREN FULLERTON

MidCoast Survey Co.
land surveying services

37 South Street
Freeport, Maine 04032

Tel (207) 865-6255

| DATE: May 5, 2018 |
| DRAWN BY: BKJ |
| CHECKED BY: BKJ |
| SCALE: 1"=20' |
| PROJ. NO: 1626-B1 |

STATE OF MAINE
BRIAN K. JOHNSON
1333
LAND SURVEYOR

Brian K. Johnson, PLS #1333

ABNER POINT ROAD

STATE OF MAINE                         BUSINESS AND CONSUMER COURT
CUMBERLAND, ss.                        DOCKET NO. BCD-RE-19-09


KINDERHAUS NORTH LLC,           )
PRIME PROPERTIES ME LLC,        )
KAREN and BRIAN FULLERTON,      )
                                )
                                )
          Plaintiffs/           )
          Counterclaim Defendants, )
                                )
                                )
v.                              )
                                )
KARL and STEPHANIE R. NICOLAS,  )
                                )
          Defendants/           )
          Counterclaim Plaintiffs. )
                                )
_____ )
                                )    ORDER ON PLAINTIFFS'
                                )    MOTIONS IN LIMINE
KINDERHAUS NORTH LLC,           )    REGARDING BURDENS OF
PRIME PROPERTIES ME LLC,        )    PROOF and ORDER OF
KAREN and BRIAN FULLERTON,      )    PRESENTATION
                                )
          Third-Party Plaintiffs, )
                                )
v.                              )
                                )
H. ALLEN RYAN and DIANNE E.     )
RYAN,                           )
          Third-Party Defendants. )
                                )

In advance of the Bench trial, Plaintiffs/Counterclaim Defendants ("Plaintiffs") have filed

a Motion in Limine to Establish Burdens of Proof at Trial, and a Motion in Limine to Establish

Order of Presentation for Trial.  The Motions are interrelated.  In essence, Plaintiffs argue that as

a matter of law they have already satisfied their initial burden of proof on the three remaining

counts of their Complaint; that as a matter of law the burden of proof on Plaintiffs' counts shifts

to Defendants/Counterclaim Plaintiffs ("Defendants"); and therefore Defendants should put on

1

their entire case first. The Court RESERVES on the substantive burdens of proof argument, and DENIES Plaintiffs' motion to require Defendants to put on their case first.

Before discussing the burdens of proof argument, the Court notes that it is proceeding narrowly and deciding as little as necessary at this stage of the proceeding, so as not to prematurely coop arguments that might better be made in post-trial briefs. The case has already been the subject of extensive prior motion practice, and the Court is reluctant to now decide the burdens of proof argument purely as a matter of law, without factual context. The primary purpose of deciding a Motion in Limine in advance of trial is to give counsel guidance on whether and how evidence may come in at trial. Where, as here, the case will be decided by a Bench trial, the goal is usually to ensure that all the evidence potentially necessary to decide the case is admitted. Counsel can then use the evidence to make their arguments in post-trial briefs. With that in mind, the Court responds to the issues presented in the Motions in Limine as follows:

Plaintiffs have three counts remaining for trial. Counts II and VII seek a declaratory judgment regarding whether installation of gravel and paving are within the scope of the respective easements in dispute. In support of their argument that Defendants bear the burden of proof on these counts, Plaintiffs rely on *Stanton v. Strong*, 2012 ME 48, 40 A.3d 1013, and *Mill Pond Condo. Ass'n v. Manalio*, 2006 ME 135, 910 A.2d 392. However, these cases appear to be inapposite, since they have more to do with access than disturbing the soil. The more applicable case appears to be *Davis v. Bruk*, 411 A.2d 660 (Me. 1980), in which the owner of the dominant estate has the burden of proof. But even if *Stanton* and *Mill Pond* are the controlling cases, the Court perceives no burden shifting in those cases. To the contrary, the *Stanton* Court found the plaintiff met his burden of proof, which seems to suggest the plaintiff retained the burden of proof.

2

Plaintiffs' Count VIII seeks injunctive relief like that sought in *Stanton*, and for the same reasons Plaintiffs retain the burden of proof.

The Court points out that it is not at this juncture deciding the substantive content of Plaintiff's burden of proof. It may be that Plaintiffs' burden of proof is minimal, and as discussed above the Court is reserving on the substantive component of the burden of proof argument. The parties can make their arguments in their post-trial briefs. Proceeding in a narrow fashion, and based on the cases brought to the Court's attention, the Court is merely determining that the burden of proof does not appear as a matter of law to immediately shift to Defendants, such that Defendants should be required to put on their case first.

Defendants retain the burden of proof on their three counterclaims, and Plaintiffs bear the burden of proof as to any affirmative defenses to those counterclaims.

Admittedly, the burdens of proof have significant overlap, given the similarity of the claims. The key at trial will be to ensure Plaintiffs and Defendants have every opportunity to admit into evidence the facts they each need to argue that their respective burdens of proof are satisfied. Given the discussion set forth above, Plaintiffs will put on their case first (however minimal they may believe it is), followed by Defendants' case. Thereafter, Plaintiffs will have an opportunity to put on any evidence they believe is necessary to respond to Defendants' case, and any evidence that may be necessary to complete the burden of proof on their own case. Defendants will then have the same opportunity. The Court will thereafter permit any party to put on rebuttal evidence. In this fashion, all parties will have ample opportunity to create the evidentiary record they believe is necessary to support their cases and defenses.

3

Accordingly, the Court RESERVES on the substantive component of Plaintiffs' Motion in Limine to Establish Burdens of Proof at Trial, and DENIES Plaintiffs' Motion in Limine to Establish Order of Presentation for trial.

So Ordered.

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Order by reference on the docket for this case.

Dated: **March 10, 20**

_____
Michael A. Duddy

Judge, Business and Consumer Docket

4

STATE OF MAINE  
CUMBERLAND, ss.

BUSINESS & CONSUMER DOCKET  
DOCKET NO. BCD-RE-19-09

KINDERHAUS NORTH LLC,  )  
PRIME PROPERTIES ME LLC, &  )  
KAREN and BRIAN FULLERTON  )  
  )  
    Plaintiffs/ Counterclaim Defendants  ON  
  )  
v.  )  
  )  
  )  
KARL NICOLAS and  )  
STEPHANIE R. NICOLAS,  )  
  )  ORDER GRANTING DEFENDANTS'  
    Defendants/ Counterclaim Plaintiffs  )  MOTION FOR PARTIAL SUMMARY  
  )  JUDGMENT  
  )  
KINDERHAUS NORTH LLC, PRIME  )  
PROPERTIES ME LLC, KAREN  )  
FULLERTON, and BRIAN FULLERTON  )  
  )  
    Third-Party Plaintiffs  )  
  )  
v.  )  
  )  
H. ALLEN RYAN and DIANNE E.  )  
RYAN  )  
  )  
    Third-Party Defendants  )  

This case arises out of a contentious dispute regarding a right-of-way depicted on the Plan of Abner's Point Lots on Baily Island, Harpswell, Maine, recorded in September 1979. By separate Order, this Court granted Plaintiffs' Motion for Partial Summary Judgment, determining that Plaintiffs have deeded easement rights in the disputed way. *See Order Granting Plaintiffs' Motion for Partial Summary Judgment and Denying Defendants' Motion for Partial Summary*

1

*Judgment*, April 24, 2020. In conjunction with their easement claims, Plaintiffs brought a number of tort claims. Now before the Court is the Motion for Partial Summary Judgment brought by Defendants Karl and Stephanie Nicolas (the "Nicolases") on those tort claims.[1] The Nicolases move the Court for summary judgment on Count X (Slander of Title), Count XI (Abuse of Process-3033 Notice), Count XII (Abuse of Process- Report to Law Enforcement), Count XIII (Nuisance), Count XIV (Conversion), and Count XV (Punitive Damages). The Nicolases contend there are no genuine issues of material fact and they are entitled to judgment as a matter of law. The Court agrees, and for the reasons set forth below grants the Nicolases' Motion for Partial Summary Judgment.

## STANDARD OF REVIEW

Summary Judgment is a procedural device for obtaining judicial resolution of matters that may be decided without fact-finding. *Curtis v. Porter,* 2001 ME 158, ¶ 7, 784 A.2d 18. Thus, summary judgment is appropriate if, viewing all factual disputes in the light most favorable to the non-moving party, there are no genuine issues of material fact that prevent judgment for the moving party as a matter of law. M.R. Civ. P. 56(c). A material fact exists when the fact is one that could affect the outcome of the case. *Farrington's Owners Ass'n v. Conway Lake Resorts, Inc.,* 2005 ME 93 ¶ 9, 878 A.2d 504. A genuine issue of material fact exists when there is sufficient evidence to require a fact-finder to choose between competing versions of the truth. *Id.* When a defendant moves for summary judgment, the plaintiff must proffer evidence sufficient to prove the essential elements of their claims without requiring the Court to speculate. However, the Court gives the party opposing summary judgment the benefit of any reasonable inferences that can be

---

[1] The Nicolases' Motion for Partial Summary Judgment is opposed not only by Plaintiffs, but also by Third Party Defendant Dianne E. Ryan, who filed a short Memorandum in Opposition of about two pages.

2

drawn from the presented facts. *Kobritz v. Severance,* 2007 ME 3, ¶ 11, 912 A.2d 1237 (citing *Perkins v. Blake,* 2004 ME 86, ¶ 7, 853 A.2d 752). The Court only considers "those portions of the record referred to, and material facts set forth in the Rule [56(h)] statements." *Longley v. Knapp,* 1998 ME 142, ¶ 16, 713 S.2d 939.

## UNDISPUTED FACTS

The parties to this action are record fee owners of certain lots depicted on the Plan of Abner's Point Lots on Bailey Island, Harpswell, Maine for Bruce Allen dated August 1979 and recorded September 29, 1979 in the Cumberland County Registry of Deeds, Book of Plans, Volume 124, Page 60 ("the Plan"). Plaintiff Prime Properties ME LLC ("Prime") is the owner of Lot 1 identified on the Plan, and Plaintiff Kinderhaus North LLC ("Kinderhaus") is the owner of Lot 2. Plaintiffs Karen L. Fullerton and Brian Fullerton co-own Lots 5 and 6. Karen Fullerton is also a member and Manager of Prime and of Kinderhaus. The Nicolases own Lot 4 as identified on the Plan.

The dispute arises over competing claims to a 20-foot-wide right-of-way that runs over the Nicolases' real estate (Lot 4) and along the easterly sideline of Lots 1 and 2 to the shore of Merriconeag Sound. On May 10, 2018, the Nicolases received copies of an email from Plaintiffs' real estate broker, leading them to believe Plaintiffs claimed a vehicular and pedestrian easement over Lot 4. (Pls.' S.M.F. ¶ 6). On May 16, 2018, Karl Nicolas expressed to his broker a plan to convince Plaintiffs to negotiate the release of their easement rights, by sending along a legal opinion and offering other compromises. (Pls.' S.M.F. ¶ 17). On that same day, Stephane Nicolas used her Wilmer Hale email to send along the legal opinion to Plaintiffs' broker, and invite Plaintiffs to work out a solution. (Pls.' S.M.F. ¶ 19). Plaintiffs felt wary about receiving the email. (Pls.' S.M.F. ¶ 22).

3

On or about May 23, 2018, the Nicolases received a letter from an attorney representing Prime Properties ME LLC and Kinderhaus North LLC as owners of Lots 1 and 2. (Defs.' S.M.F. ¶ 1). The letter claimed that the owners of Lots 1 and 2 had a right to use the disputed right-of-way, but that there was a lamp post and series of trees blocking it. (Defs.' S.M.F. ¶ 2). Plaintiffs also informed the Nicolases that they planned to construct a gravel drive on the right-of-way, requiring the removal of the aforementioned obstructions. (Pls.' S.M.F. ¶ 24). Plaintiffs provided the Nicolases the opportunity to remove the obstructions themselves before beginning construction on the gravel right-of-way but stated the Nicolases did not have an obligation to do so. (Pls.' S.M.F. ¶ 24, Defs.' S.M.F. ¶ 2). On June 5, 2018, Karl Nicolas wrote to his broker: "Quick update, we're going to war unless they decide to come to the table and negotiate." (Pls.' S.M.F. ¶ 26).

In early June, the Nicolases learned that the Town of Harpswell recorded notices in the Cumberland County Registry of Deeds to extend the deadline for automatic vacation of "paper streets" pursuant to 23 M.R.S. § 3032. (Pls.' S.M.F. 27; Defs.' S.M.F. ¶¶ 3, 5). The first notice included the disputed right-of-way as a paper street whose deadline for automatic vacation was extended 20 years, but the second notice omitted the disputed right-of-way from the list. The Nicolases understood the omission to mean that the public right to the disputed right-of-way had been vacated. (Pls.' S.M.F. 27; Defs.' S.M.F. ¶ 6). On June 14, 2018, the Nicolases recorded a Notice pursuant to 23 M.R.S. § 3033 ("the 3033 Notice") in the Cumberland Country Registry of Deeds to invoke the statutory procedure for vacating private rights over the disputed right-of-way. (Pls.' S.M.F. ¶ 29; Defs.' S.M.F. ¶ 7). A copy of the 3033 Notice was provided to Plaintiffs' attorney by email on June 20, 2018. (Pls.' S.M.F. ¶ 33; Defs.' S.M.F. ¶ 8). On June 28, 2018, through counsel, Plaintiffs acknowledged receipt of the Section 3033 Notice and explained to the

4

Nicolases their belief that for various reasons the recording of the Section 3033 was in error. (Pls.' S.M.F. ¶ 34).

On June 29, 2018, the Nicolases arrived at their property (Lot 4) and found Plaintiff Karen Fullerton in the process of removing three ornamental trees and a juniper bush located within the right-of-way. (Pls.' S.M.F. ¶ 35; Defs.' S.M.F. ¶ 10). The trees and bush were the obstructions previously described in Plaintiffs' May 23, 2018 notice to the Nicolases. (Pls.' S.M.F. ¶ 35). As Karen Fullerton finished removing the juniper bush a verbal altercation ensued. (Pls.' S.M.F. ¶ 36; Defs.' S.M.F. ¶ 11). Karen Fullerton eventually left the property still believing she had a right to use the disputed right-of-way. (Defs.' S.M.F. ¶¶ 12, 13). In response to the altercation, Defendant Stephanie Nicolas contacted law enforcement, resulting in the Cumberland County Sherriff visiting the Fullertons' home to serve a no trespassing notice. (Defs.' S.M.F. ¶ 14). Karen Fullerton informed the Sherriff's Deputy that she owned land accessed by an easement over the Nicolases' property, and as a result the Deputy did not serve the no trespass notice. (Pls.' S.M.F. ¶ 43). The Fullertons then agreed to attend pre-trial mediation with the Nicholases on the condition that the no trespass order was withdrawn. (Pls.' S.M.F. ¶ 44). On July 16, 2018, through counsel, the Nicolases withdrew their request of the Sherriff to serve Ms. Fullerton with an order prohibiting her from entering the Nicolases' property or the disputed right-of-way. (Pls.' S.M.F. ¶ 45). The Nicolases' have not since placed obstructions in the way, nor tried to prevent Plaintiffs' use of the disputed right-of-way. (Defs.' S.M.F. ¶ 24).

In July of 2018, the Nicolases learned that the previously recorded 3033 Notice misidentified the owner of Lot 3 on the Plan. The Nicolases responded by recording a corrected notice in the Cumberland County Registry of Deeds, attempting to continue the process for vacating certain private rights over the disputed right-of-way. (Defs.' S.M.F. ¶ 23).

5

Plaintiffs initially intended to sell Lot 1, and in preparation planned to install a well and construct a gravel access drive for vehicular access to Lots 1 and 2. (Pls.' S.M.F. ¶ 2). Plaintiffs ultimately decided to postpone or minimize their plans until after the dispute was resolved, on advice of counsel, to avoid getting the police involved, and for good conscience.[2] (Defs.' Additional S.M.F. ¶¶ 15, 16.) Plaintiffs nevertheless removed trees and bushes in the way, and used the way to access the shore and Lots 1 and 2. (Pls.' S.M.F. ¶¶ 35, 52.) Further, Plaintiffs' surveyor and landscapers entered and utilized the disputed way to prepare for constructing a limited gravel surface and to access Lots 1 and 2. (Pls.' S.M.F. ¶¶ 48, 53.)

Plaintiffs continue to pay taxes and an equity loan to carry the property longer than they wished. (Pls.' S.M.F. ¶ 60). Plaintiffs incurred the cost of remediating ruts on Lots 1 and 2 caused by tire tracks left by their agents using temporary access across Lot 2. (Pls.' S.M.F. ¶ 60). Plaintiffs also incurred legal fees. (Pls.' S.M.F. ¶ 60.) On September 21, 2018, Plaintiffs filed their Complaint with the Superior Court.

## DISCUSSION

The Nicolases seek summary judgment on all of the tort claims in the Complaint. The Court addresses each of the claims in the order in which they are pled in the Complaint.

**Count X: Slander of Title**

Plaintiffs assert that the Nicolases slandered the title to their property when they filed a notice pursuant to 23 M.R.S. § 3033 in the Cumberland County Registry of Deeds. Section 3033, in conjunction with 23 M.R.S. § 3032, sets up a process for claimants to contest the existence of

---

[2] Plaintiffs' efforts to create a genuine dispute of fact regarding these points is unavailing. First, Karen Fullerton's deposition testimony is clear. Second, Fullerton's later affidavit, prepared specifically for summary judgment purposes, doesn't substantively change her testimony. Her affidavit adds that one of the reasons Plaintiffs reduced or avoided use of the easement was because the Nicolases threatened a lawsuit, but that is subsumed within her deposition testimony, and as discussed later doesn't change the analysis.

private rights in proposed, unaccepted ways.  *See* 23 M.R.S. §§ 3032, 3033. Plaintiffs contend that the Section 3033 notice was false, published with malice, and resulted in damages.

To prove slander of title, a claimant must establish (1) there was a publication of a slanderous statement disparaging claimant's title; (2) the statement was false; (3) the statement was made with malice or made with reckless disregard of its falsity; and (4) the statement caused actual or special damages. *Rose v. Parsons,* 2013 ME 77, ¶ 13, 76 A.3d 343, 347 (quoting *Colquhoun v. Webber,* 684 A.2d 405, 409 (Me. 1996). The title interest required to maintain a claim for slander of title is generally considered to be some legally enforceable degree of ownership. RESTATEMENT (SECOND) OF TORTS § 624.

In this case, Plaintiffs contend the Section 3033 notice was false, both as a whole, and in its reference to an unaccepted way, because under Maine law the Section 3033 notice could not be used to extinguish the Plaintiffs' deeded easement rights to a used, constructed way. Plaintiffs further assert that the Section 3033 notice was so manifestly false under Maine law, that (in concert with certain alleged conduct on the part of the Nicolases) the Section 3033 notice was made with malice or reckless disregard for its falsity. The Nicolases counter that they had a plausible basis for recording the Section 3033 notice, and in any event, a Section 3033 notice cannot as a matter of law give rise to a slander of title claim.

In slander of title cases, falsity and malice are usually analyzed based on the extent to which an allegedly slanderous title statement finds support in Maine law.  In *Fischer v. Bar Harbor*, 673 F. Supp. 622, 624 (D. Me. 1987), for example, a bank placed a lien on a boat hull.  The Court's analysis of the slander of title claim focused on whether, under the circumstances of that case, the bank had a good faith basis for placing a lien on the hull. *Id.* at 625-626.  It was implicitly accepted that if the lack of grounds for recording the lien were sufficiently "false," meaning unsupported by

7

the law, the lien constituted an actionable statement. *See also Colquhoun*, 684 A.2d at 410 (frivolous recorded quitclaim deed was actionable).

In the present case, setting aside for the moment whether the Nicolases' had plausible grounds for recording a Section 3033 notice as a part of their easement dispute (and hence whether the notice was false or not), the Court agrees with Defendants that as a matter of law, a Section 3033 notice cannot give rise to a slander of title action. At its heart, slander of title is "a form of the tort of injurious falsehood . . . " *Colquhoun*, 684 A.2d at 409. Not all false statements are actionable. With regard to the tort of defamation, for instance, statements of opinion are not actionable. *See Ballard v. Wagner*, 2005 ME 86, ¶ 10, 877 A.2d 1083 (statements of opinion not actionable). A Section 3033 notice is analogous to an opinion. The notice announces to owners of lots in a subdivision, that one of the owners claims ownership of an unaccepted way. The notice is not the final say on the matter, but rather the first step in a process that gives all potentially affected parties an opportunity to assert their own claims to ownership in the way.[3] Unlike the lien in *Fischer*, or the quitclaim deed in *Colquhoun*, a Section 3033 notice in and of itself does not diminish anyone's property interest, or undermine their claim to a property interest.

Even if a Section 3033 notice can serve as the basis for a slander of title action, its use by the Nicolases in this case was not so improbable as to make the notice, in whole or in part, false. At the time Defendants' filed their Section 3033 notice, they were under the impression that in 2017, public rights to the disputed way had been vacated by the Town of Harpswell pursuant to 23 M.R.S. § 3032. A person claiming to own a proposed, unaccepted way or portion of a proposed

---

[3] Maine's Paper Streets Act, 23 M.R.S. §§ 3027, 3031-3035; 33 M.R.S. §§ 460, 469-A, was enacted by the Legislature to address ancient claims to land, and clarify title to public or private rights featured on recorded subdivision plans. Should every arguably erroneous filing of a Section 3033 notice be challenged with a slander of title claim, a chilling effect may result, causing parties to avoid addressing old claims to land for fear of tort liability. Such a result would frustrate the legislative purpose of the Paper Streets Act. *See* 23 M.R.S. § 3035.

unaccepted way deemed vacated under Section 3032 may record, in the registry of deeds where the subdivision plan is recorded, a confirmed copy of the notice set forth in Section 3033. 23 M.R.S. § 3033(1). The existence of Plaintiffs' deeded easement rights, and the issue of whether the way was constructed and used, were disputed by the Nicolases. Because the Nicolases followed the statutory process to assert a claim of ownership after the Town of Harspwell's decision to allow public rights in the Disputed Way to be vacated, and because the Nicolases disputed the issues which Plaintiffs argued rendered the Section 3033 notice in error, the Court concludes that the Nicolases' use of the Section 3033 notice was not so improbable as to make the notice, in and of itself, false.[4]

Accordingly, the Court grants the Nicolases' Motion for Partial Summary Judgment with regard to Count X.

### Count XI: Abuse of Process— §3033 Notice

In Count XI, Plaintiffs similarly assert that the Nicolases engaged in an abuse of process when they filed the notice pursuant to 23 M.R.S. § 3033 in the Cumberland County Registry of Deeds. As discussed above, Section 3033, in conjunction with 23 M.R.S. § 3032, provides a process for claimants to contest the existence of private rights in proposed, unaccepted ways. *See* 23 M.R.S. §§ 3032 & 3033. Plaintiffs contend that the Nicolases knew or should have known that they could not satisfy § 3032, and by extension § 3033's requirements to vacate Plaintiffs' rights to the disputed right-of-way. In Plaintiffs' view, the § 3033 notice was filed in bad faith, with the intent of forcing Plaintiffs to bring suit to defend their express deeded easement rights, or otherwise to force Plaintiffs to make concessions with regard to their easement rights.

---

[4] Further, the Section 3033 notice in this case does not mention Plaintiffs' properties, nor make any statements regarding the existence of Plaintiffs' deeded easement rights. Rather, the Section 3033 notice asserted a claim of ownership to the land burdened by the Disputed Way, subject to potential claims of private right by other owners of lots in the subdivision plan.

9

In Maine, abuse of process claims arise when litigants misuse individual legal procedures after a lawsuit has been filed,[5] and when contractors misuse the procedures for obtaining a mechanics lien. *Advanced Constr. Corp v. Pilecki*, 2006 ME 84, ¶ 23, 901 A.2d 189. In either context, a claimant must show two elements: (1) the use of process in a manner improper in the regular conduct of the proceeding, and (2) the existence of an ulterior motive. *Id.* In this case, whatever the Nicolases ulterior motive, the Section 3033 notice they filed preceded the initiation of a lawsuit, and was not filed in connection with a mechanics lien. As a matter of law, therefore, Plaintiffs' abuse of process claim must fail.

Plaintiffs object that this reading of the case law is too cramped. Plaintiffs point to *Pilecki* and *Kleinschmidt v. Morrow*, 642 A.2d 161, 164 (Me. 1994), for the proposition that the Law Court has evolved the abuse of process tort beyond abuse of procedures in litigation. Abuse of mechanics lien procedures, argue Plaintiffs, is but one example of abuse of process prior to the initiation of a lawsuit. According to Plaintiffs, abuse of the Section 3033 notice represents a natural pre-lawsuit extension of the tort, akin to abuse of mechanics lien procedures.

The problem for Plaintiffs is that the Law Court has not explained its mechanics lien case law according to this evolutionary paradigm. In *Kleinschmidt*, the Law Court declined to second guess a jury verdict award for damages. *Id.* at 164. In *Pilecki*, the Law Court acknowledged *Kleinschmidt* but merely noted that, along with misuse of procedures during a lawsuit, misuse of mechanics lien procedures could give rise to an abuse of process claim. The Law Court did not explain its conclusion in evolutionary terms, and did not suggest that the elements of abuse of

---

[5]Abuse of process claims are distinguished from claims of malicious prosecution, *see Pepperell Trust Co. v. Mountain Heir Financial Corp,* 1998 ME 46, ¶ 16, 708 A.2d 651 (treating abuse of process and malicious prosecution as "distinct causes of action related to the misuse of the legal system"). Malicious prosecution applies when a party wrongfully initiates, continues, or procures legal proceedings. *Id.* at ¶ 17. Plaintiffs have not alleged malicious prosecution.

process could be generalized to any pre-lawsuit abuse of process. It may very well be that abuse of process claims based on abuse of mechanics lien procedures are the tip of the spear, but that is for the Law Court to decide. Based on the current development of the precedent, the Court grants Defendants' Motion for Partial Summary Judgment with regard to Count XI.

### Count XII: Abuse of Process— Complaint to Law Enforcement

Count XII of Plaintiffs' complaint asserts that the Nicolases engaged in an abuse of process when they made a report to law enforcement after the parties' June 29, 2018 altercation regarding the disputed right-of-way. The elements of an abuse of process action are discussed above. *See also Tanguay v. Asen*, 1998 ME 277, ¶ 5, 722 A.2d 49. A complaint to law enforcement is not, by itself, a court document or process. In order to avoid this dispositive deficiency, Plaintiffs point to the fact that the Nicolases called the Sheriff's office to serve Ms. Fullerton with a No Trespass Order pursuant to 17-A M.R.S. § 402(1)(e). Plaintiffs assert that a No Trespass Order serves a notice function similar to that of a lien filed in the Registry of Deeds, and that when abused as in *Kleinschmidt* and *Advanced Constr. Corp.,* supports a claim for abuse of process. However, it is undisputed that upon speaking with Ms. Fullerton, the Sheriff's Deputy took back the No Trespass Notice he originally planned to serve. (Pls.' S.M.F. ¶ 43; Defs.' S.M.F. ¶ 14). Further, Maine Courts have consistently held that the act of making a complaint to law enforcement causes process to issue but does not constitute a misuse of process itself. *Deangelis v. Maine Educ. Ass'n*, No. CV-03-493, 2004 WL 1925543, at *1 (Me. Super. June 30, 2004) (citing *Nadeau v. State*, 395 A.2d 107, 116 (Me. 1978); *Packard v. Central Maine Power Co*., 477 A.2d 264, 265 (Me. 1984)[6]. The Court grants the Nicolases' Motion for Partial Summary Judgment with regard to Count XII.

---

[6] In *Packard v. Central Maine Power Co.,* the Court also noted that "even if the plaintiff could prove [Defendant] acted wrongfully in reporting the matter to law enforcement officials, such evidence is not relevant to an allegation of abuse of process." *Packard*, 477 A.2d 264, 267 (Me. 1984).

**Count XIII: Nuisance**

In Count XIII of their Complaint, Plaintiffs contend that the Nicolases' conduct in challenging the easement constitutes a common law, private nuisance. A private nuisance "consists in a use of one's own property in such a manner as to cause injury to the property, or other right, or interest of another. *Norcross v. Thoms,* 51 ME 503, 504 (1863). To succeed on a private nuisance claim, a plaintiff must prove: 1) the defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use; 2) there was some interference of the kind intended; 3) the interference was substantial such that it caused a reduction in the value of the land; and 4) the interference was of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land. *West v. Jewett and Noonan Transportation, Inc.*, 2018 ME 98, ¶ 14, 189 A.3d 277 (citing *Charlton v. Town of Oxford,* 2001 ME 104, ¶ 36, 774 A.2d 366). The Nicolases contend that Plaintiffs fail to satisfy these elements because they cannot establish that the Nicholases impeded or obstructed their use of the disputed right-of-way, or that the interference caused a reduction in the value of their land.

The undisputed facts show that the Nicolases tried to persuade Plaintiffs to negotiate the release of their easement rights; used their law firm email; filed a Section 3033 notice; exchanged harsh words; and on one occasion reported Plaintiffs to the police, all as part of challenging Plaintiffs' rights to the disputed easement. In the face of this conduct, Plaintiffs decided to postpone their plan to construct a full gravel surface over the way, or to market Lots 1 or 2, until after the dispute was resolved. Plaintiffs choose to minimize their use of the easement on advice of counsel, to avoid getting the police involved, and for good conscience. Plaintiffs nevertheless removed trees and bushes in the way, and used the way to access the shore and Lots 1 and 2.

12

Further, Plaintiffs' surveyor and landscapers entered and utilized the disputed way to prepare for constructing a gravel surface and to access Lots 1 and 2.

Plaintiffs argue that in order to survive summary judgment, all they need to do is generate a dispute about whether the Nicolases caused "some interference" with their right to use the easement. Plaintiffs' emphasis on the "some interference" element of the tort is understandable. There is indeed no dispute that the Nicolases acted with the intent of interfering with (indeed terminating) Plaintiffs' use and enjoyment of the disputed way, and that there was some interference of the kind intended. Plaintiffs nevertheless fall short of satisfying the remaining two elements of the tort: substantiality, and unreasonableness. The Court first addresses the unreasonableness element.

In order to provide the basis for a private nuisance claim, the interference must be of such a nature, duration or amount as to constitute unreasonable interference. *West*, 2018 ME 98, ¶ 14. Not all interference qualifies. "Life in organized society, and especially in populous communities, involves an unavoidable clash of individual interests." Keeton, W.P. et al., *Prosser and Keeton on The Law of Torts*, § 88 (West Publishing, Fifth Edition, 1984) p. 629, quoting *Restatement (Second) of Torts*, § 822, Comment j. In this case, the Nicolases engaged in a legal strategy intended to persuade Plaintiffs to release their easement claims, or to refrain from exercising their rights to use the disputed easement until the issue was decided in court. In the unfortunate vernacular of Karl Nicolas, the Nicolases mounted a legal "war" against Plaintiffs. The legal dispute took time, and the parties were somewhat stalemated on the ground during the pendency of the legal proceedings. But a distinction must be made between conduct, and the interference itself; in order to be actionable, the interference itself must be unreasonable, irrespective of the conduct. Keeton, et al., *Prosser and Keeton on The Law of Torts* § 87 at 623 (5th ed. 1984). In

13

this case, the Nicolases conduct was objectionable to Plaintiffs, and caused them to be wary. But the interference that resulted—delay and stalemate until the legal dispute was decided in court— was not unreasonable.

This Court has now decided the right-of-way issue, and (at least at the trial court level) Plaintiffs have won, and the Nicolases have lost, the easement war. As offensive and costly to Plaintiffs as the Nicolases' war undoubtedly was, no court has declared the Nicolases' theories or claims frivolous, and neither the Nicolases (as attorneys) nor their legal counsel have been sanctioned. Delay and frustration while legal issues are sorted out in court are a normal part of life in our society. On these facts, the interference caused by the Nicolases (in contradistinction to their conduct) was not of such a nature, duration or amount as to constitute unreasonable interference for purposes of establishing a nuisance claim.[7]

Even if it was, Plaintiffs have not generated a genuine dispute of material fact as to substantiality. In order to support a claim for private nuisance, the interference complained of must be substantial. *West*, 2018 ME 98, ¶ 14. When considering the substantiality element, there is a distinction between interference that "'affects the physical condition of the plaintiff's land' and conduct that involves 'mere physical discomfort or mental annoyance.'" *West*, 2018 ME 98, ¶ 15, quoting Keeton, et al., *Prosser and Keeton on the Law of Torts* § 88 at 627 (5th ed. 1984). For the former, the substantial nature of the interference is not in doubt because of the physicality of the invasion.[8] *Id.* For the latter, substantiality must by shown by a deprivation in the market or rental

---

[7] Even if the Nicolases' conduct was worse, as alleged by Plaintiffs but controverted by the Nicolases, it would not change the analysis, because the resulting interference was the same.

[8] An example of such interference occurred in *West,* 2018 ME 98, when an oil tanker overturned, leaking oil onto the plaintiffs' property. The Law Court held that the spill "affected the physical condition" of the plaintiffs' property sufficient to meet the substantiality element of private nuisance. Interference affecting the physical condition of land has also been found when defendants were responsible for flooding plaintiffs' land with water. *See McRae v. Camden & Rockland Water Co*., 138 Me. 110, 22 A.2d 133 (1941); *Goodwin v. Texas Co.,* 134 ME 266, 185. A. 695, 696 (1936).

value of the land. *Id.; see also Charlton, 2001 ME 104, ¶ 36.* In this case, the conduct complained of falls into the latter category. The Nicolases have not affected the physical condition of the disputed way, nor have they physically obstructed the way. Rather, the Nicholases engaged in a legal strategy Plaintiffs found objectionable; which made Plaintiffs wary; and which caused delays on the ground while the legal claims were resolved in court. Accordingly, in order to survive summary judgment, Plaintiffs must provide evidence that their land has been reduced in value because of the Nicolases' interference.

Plaintiffs provide no such evidence. Instead, Plaintiffs provide evidence of legal expenses, and of costs to remediate tire ruts on Lot 2. Plaintiffs also point to a delay in marketing their property. However, Plaintiffs provide no evidence that their land has been reduced in value. It follows, therefore, that Plaintiffs have failed to generate a genuine dispute of material fact on substantiality. The Court grants Defendants' Motion for Partial Summary Judgment with regard to Count XI.

**Count XIV: Conversion**

Defendants also request summary judgment on Plaintiffs' conversion claim in Count XIV. Generally, conversion is the invasion of a party's possession or right to possession of property. *Barron v. Shapiro & Morley*, LLC, 2017 ME 51, ¶ 14, 157 A.3d 799 (citing *Withers v. Hackett*, 1998 ME 164, ¶ 7, 714 A.2d 798). The elements of a conversion claim require (1) the person claiming that his or her property was converted has a property interest in the property; (2) the person had the right to possession of at the time of the alleged conversion; (3) the party with the right to possession made a demand for its return that was denied by the holder. *Id.*

15

Maine law has long limited the tort of conversion to claims relating to personal, rather than real property. In *Whidden v. Seelye*, a Plaintiff brought an action in trover[9] against a defendant who had cut trees on the plaintiff's real estate. The Court affirmed that trover is inapplicable to injuries to land or other real property. *Whidden v. Seelye,* 40 Me. 247, 255 (1855). Maine Courts have since maintained this approach, applying it directly to claims of conversion. *See Breen v. Lucas,* No. RE-03-19, 2005 WL 6013511 (Me. Super. July 04, 2005) (Granting summary judgment "Given that the tort of conversion, by its very nature, deals with personal and not real property. . ."); *Morton v. Burr,* No. BCD-RE-13-03, 2014 WL 380895, at *7 (Me. B.C.D. Jan. 16, 2014 (Granting motion to dismiss on grounds that real property is not subject to the tort of conversion). Regardless of whether Defendants denied Plaintiffs access to the disputed right-of-way or hindered their ability to effectively market their real property, the tort of conversion does not apply to such facts. Accordingly, summary judgment is granted in favor of Defendants on Count XIV.

**Count XV:  Punitive Damages**

Since none of the tort claims have survived that could support punitive damages, the Court grants the Nicolases' Motion for Partial Summary Judgment on Count XV.

---

[9] At the time, trover was the action by which a party could maintain a claim of conversion in a foreign jurisdiction.

**CONCLUSION**

For all the foregoing reasons, summary judgment is entered in favor of the Nicolases on Counts X, XI, XII, XIII, XIV, and XV of the Complaint.

The Clerk is instructed to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

So Ordered.

Dated:_May 1, 2020_____                    _____/s_____
                                            Michael A. Duddy Judge,
                                            Business and Consumer Court

**Kinderhaus North, LLC**
**Prime Properties ME, LLC**
**Karen and Brian Fullerton**


**v.**

Karl and Stephanie Nicolas
**H. Allen and Dianne Ryan (Parties in Interest)**



**Kinderhaus North, LLC**
**Prime Properties ME, LLC**
**Karen and Brian Fullerton**      Christopher Pazar, Esq.
                                            Drummond & Drummond
                                            One Monument Way
                                            Portland, ME 04101
                                    Brendan O'Rourke, Esq.
                                            Thompson, Bowie & Hatch
                                            PO Box 4630
                                            415 Congress Street, 5th Floor
                                            Portland, ME 04112-4630
                                    David Soley, Esq.
                                            Bernstein, Shur, Sawyer & Nelson
                                            PO Box 9729
                                            100 Middle Street
                                            Portland, ME 04104-5029



Karl and Stephanie Nicolas
**H. Allen and Dianne Ryan**      Keith Glidden, Esq.
                                            Verrill Dana, LLP
                                            One Federal Street, 20th Floor
                                            Boston, MA 02108-4407
                                    Jason Dionne, Esq.
                                            Isaacson & Raymond, PA
                                            PO Box 891
                                            Lewiston, ME 04248

**H. Allen and Dianne Ryan**      David Jones, Esq.
                                            Jensen, Baird, Gardner, Henry
                                            11 Main Street, Sute 4
                                            Kenebunk, ME 04043

KINDERHAUS NORTH LLC, )
PRIME PROPERTIES ME LLC, & )
KAREN and BRIAN FULLERTON )
 )
 Plaintiffs/ Counterclaim Defendants )
 )
 v. )
 )
KARL NICOLAS and )
STEPHANIE R. NICOLAS, )
 )
 Defendants/ Counterclaim Plaintiffs )
 )
───────────────── )
 )
KINDERHAUS NORTH LLC, PRIME )
PROPERTIES ME LLC, KAREN )
FULLERTON, and BRIAN )
FULLERTON )
 )
 Third-Party Plaintiffs )
 )
v. )
 )
H. ALLEN RYAN and DIANNE E. )
RYAN )
 )
 Third-Party Defendants )

ORDER GRANTING PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY
JUDGMENT and DENYING
DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT

This case involves a disputed right-of-way near the ocean in Harpswell, Maine. Before the Court are two motions: (1) Plaintiffs/Counterclaim Defendants' Motion for Partial Summary Judgment on Counts I and III of their Complaint, and against Counts I and IV of the Counterclaim filed against them by the Defendants/Counterclaim Plaintiffs' Karl Nicolas and Stephanie R. Nicolas ("the Nicolases"), and (2) the Nicolases' counter Motion for Partial Summary Judgment

1

on the same claims. The parties agree there are no genuine issues of material fact and thus these motions may be decided as a matter of law. The Court GRANTS Plaintiffs' Motion for Partial Summary Judgment, and DENIES the Nicolases' counter Motion for Partial Summary Judgment.

## BACKGROUND

The parties to this action are record fee owners of certain lots depicted on the Plan of Abner's Point Lots on Bailey Island, Harpswell, Maine for Bruce Allen dated August 1979 and recorded September 29, 1979 in the Cumberland County Registry of Deeds, Book of Plans, Volume 124, Page 60 ("the Plan"). Plaintiff Prime Properties ME LLC ("Prime") is the owner of Lot 1 identified on the Plan, and Plaintiff Kinderhaus North LLC ("Kinderhaus") is the owner of Lot 2. Plaintiffs Karen L. Fullerton and Brian Fullerton co-own Lots 5 and 6. Karen Fullerton is also a member and Manager of Prime, and Kinderhaus. Meanwhile, Defendants and counterclaim Plaintiffs Karl and Stephanie Nicolas own Lot 4 as identified on the Plan.

Bruce L. Allen and Joanne R. Allen ("the Allens") owned the property on Abner's Point that was subdivided, and created the properties subject to this lawsuit. Lot 4 was the first lot conveyed by the Allens, acquired by Edward and Florence Schaub on November 3, 1979, deed recorded in the Cumberland County Registry of Deeds at Book 4526, Page 170 ("the Allen to Schaub Deed"). The Allen to Schaub Deed contains the following relevant language:

> The above described Lot 4 is conveyed subject to a twenty (20) foot wide right of way for vehicular as well as foot traffic for the benefit of the owners of Lots 1 and 2 on said Plan of ABNER'S POINT. Said right of way being located on the southwesterly boundary of Lot 4. For a more particular description of the Lot and rights of way, reference may be had to the aforesaid Plan of ABNER'S POINT.

(Stip S.M.F. ¶ 15 and Exhibit E thereto.) Subsequent deeds conveying Lot 4 contain virtually identical language as the Allen to Schaub Deed until the Defendants' predecessors in title, the Favreaus, purchased Lot 4 pursuant to the "Schmutz to Favreau Deed" in 2003. The Schmutz to

2

Favreau Deed eliminated the express language that Lot 4 was subject to a right of way "for vehicular as well as foot traffic for the benefit of the owners of Lots 1 and 2." Instead, the deed stated that Lot 4 was conveyed "subject to a twenty (20) foot wide right of way for the benefit of all lots as shown on the Plan." (Exhibit I to Stip. S.M.F.). When the Nicolases purchased Lot 4 from the Favreaus, the deed contained functionally equivalent language to that found in the Schmutz to Favreau Deed.

Prior to conveying Lot 4 to the Nicolases, the Favreaus conveyed a "Walking Right-of-Way/Easement Deed" to the Fullerton's predecessor in title, Joanne R. Allen, Trustee of the Joanne R. Allen Living Trust, and Lorraine L. Darling, Successor Trustee of the Bruce L. Allen Irrevocable Administrative Trust (the "Allen Trustees")). This deed granted a "perpetual walking right-of-way/easement situated on our land" described as:

> A twenty (20) foot wide walking right-of-way/easement running along the southwesterly boundary line of Lot 4 (owned by the Grantors-Favreau) as shown on the Plan of Abner's Point Lots on Bailey Island, Harpswell, Maine for Bruce Allen dated August, 1979 and recorded in the Cumberland County Registry of Deeds in Plan Book 124 at Page 60. Said walking right-of-way/easement is located in the area on said plan delineated as "20' R/W" and runs from the northwest corner of Lot 5 on said plan to Merriconeag Sound. Said walking right-of-way/easement benefits all lots on said plan.

(Stip. S.M.F. ¶ 29 and Exhibit S thereto.) At the time the Favreaus granted the Walking Right-of-Way/Easement they owned Lot 4 on the Plan, and deeded the walking right-of-way to the Allen Trustees, who were then-owners of Lots 5 and 6 on the Plan. When the Fullertons purchased Lots 5 and 6, the deed stated that the lots were conveyed "with the benefit of. . . a walking right-of-way easement as described in the [Walking Right-of-Way/Easement Deed]."

Plaintiffs initiated this lawsuit in an attempt to enforce the twenty foot vehicular and pedestrian easement they claim was reserved for and runs with Lots 1 and 2, as well as the walking right of way they claim benefits Lots 5 and 6. The Nicolases disagree, and filed a cross-motion for

3

partial summary judgment contending: 1) the Allen to Schaub Deed failed to reserve an easement appurtenant to Lots 1 and 2; and 2) the walking right of way granted to the Fullertons' predecessor was an easement in gross and therefore does not remain for the benefit of Lots 5 and 6.

## STANDARD OF REVIEW

Summary judgment is appropriate if, based on the parties' statements of material fact and the cited record, there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. M.R. Civ. P. 56(c); *Levine v. R.B.K. Caly Corp.,* 2001 ME 77, ¶ 4, 770 A.2d 653. A genuine issue of material fact exists when a fact-finder must choose between competing versions of the truth, even if one party's version appears more credible or persuasive. *Id.* A fact is material if it has the potential to affect the outcome of the suit. *Id.* Cross motions for summary judgment "neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment per se." *F.R. Carroll, Inc. v. TD Bank, N.A.*, 2010 ME 115, ¶ 8, 8 A.3d 646 (quoting *Wightman v. Springfield Terminal Ry. Co.,* 100 F.3d 228, 230 (1st Cir. 1996)).

## DISCUSSION

### I. Count I: Prime (owner of Lot 1) and Kinderhaus (owner of Lot 2) have Express Deeded Easement Rights Over the Nicolases' Property (Lot 4)

An easement is a right of use over the property of another. *Stickney v. City of Saco*, 2001 ME 69, ¶ 31, 770 A.2d 592. Under Maine Law, easements can be created in multiple ways, including by express grant or reservation. *O'Connell v. Larkin*, 532 A.2d 1029, 1042 (Me. 1987). Relevant to this matter, easements by reservation exist where property is conveyed *subject to* an easement for the benefit of the land retained by the grantor. *Id.* (citing *Brown v. Dickey,* 106 Me. 97, 100, 75 A. 382 (1909)(emphasis added). In Count I of their Complaint, Plaintiffs ask the Court to declare that as a matter of law, the Allen to Schaub Deed unambiguously reserved express easement rights over Lot 4, now owned by the Nicholases.

4

When interpreting a deed, "the scope of a party's easement rights must be determined from the unambiguous language on the face of the deed." Courts must give a deed's words their general and ordinary meaning to see if they create any ambiguity. *Green v. Lawrence,* 2005 ME 90, ¶ 7, 877 A.2d 1079. If a deed description references a plan, then the entirety of the plan becomes part of the deed. *Sleeper v. Loring,* 2013 ME 112, ¶ 13, 83 A.3d 769. The referenced plan is then interpreted alongside the deed, and in the same manner. *Id.* If a deed's terms are unambiguous, Courts do not speculate to the parties' actual or probable objectives. Instead, Courts will enforce the language within the four corners of the deed, and only consider the intentions expressed therein. *Sleeper v. Loring,* 2013 ME 112, ¶ 16, 83A.3d 769; *See Stickney,* 2001 ME 69, ¶¶ 34-35, 770 A.2d 592.

The pertinent language in the Allen to Schaub deed conveying Lot 4, now owned by the Nicolases, reads as follows:

> A certain lot or parcel of land situated in Harpswell, County of Cumberland and State of Maine, on Abner's Point, so-called, and described as Lot 4 on Plan of ABNER'S POINT, LOTS ON BAILEY'S ISLAND, HARPSWELL, MAINE, FOR BRUCE ALLEN dated August 1979 and recorded in the Cumberland County Registry of Deeds in Plan Book 124 at Page 60, to which Plan with its record reference may be had for a more particular description of the premises conveyed herein.
> . . .
> *The above described Lot 4 is conveyed subject to a twenty (20) foot wide right of way for vehicular as well as foot traffic for the benefit of the owners of Lots 1 and 2 on said Plan of ABNER'S POINT. Said right of way being located on the southwesterly boundary of Lot 4. For a more particular description of the Lot and rights of way, reference may be had to the aforesaid Plan of ABNER'S POINT.*

(Exhibit E to Stip. S.M.F.)(Emphasis Added). It is clear from the above language that the Allens reserved an easement on Lot 4 at the time they conveyed it to the Schaubs. In their deed, the Allens described the location and dimensions of the easement as being 20 feet in width along the southwesterly boundary of Lot 4. In addition to the deed's description, the Plan referenced in the

deed provides a visual representation of the easement and its location. The deed also states the purpose of the easement and the land benefitted by it; the easement was established to permit the vehicular and pedestrian access of Lots 1 and 2, both retained by the Allens. Thus, the Allens' intent to establish an easement for the benefit of their retained land is unambiguous, supported by both the Allen to Schaub Deed and the attached Plan.

The Nicolases do not disagree with Plaintiffs' factual allegations. Rather, they assert: 1) the Allen to Schaub Deed did not contain a clear and express "reservation" of a property right in Lot 4; 2) the phrase "subject to" is insufficient to reserve an easement under Maine law; and 3) the Allens failed to demonstrate their intent to reserve rights as Grantors, and instead the Deed's reference to Lots 1 and 2 was actually to benefit future, third-party lot owners. The Court will address each of these arguments in turn.

First, although the Allen to Schaub Deed does not use the terms "reserve" or "reservation", the plain language of the Deed (in conjunction with the Plan) demonstrates the Allens' clear intent to establish an easement for the benefit of their retained parcels (Lots 1 and 2). While deeds often expressly reserve easements using the words "reserve" or "retain", Maine Courts have consistently avoided imposing arbitrary technical requirements that frustrate the interests of the parties. *Stickney*, 2001 ME 69, ¶¶ 34-35, 770 A.2d 592; *O'Donovan,* 1999 ME 71, ¶ 10, 728 A.2d 681; *O'Neill v. Williams,* 527 A.2d 322, 323 (Me. 1987). The language of the Deed is clear: the Allens intended to convey Lot 4 "subject to a twenty (20) foot wide right of way for vehicular as well as foot traffic for the benefit of the owners of Lots 1 and 2. . ." Defendant's argument that use of the phrase "subject to" in a deed is insufficient to reserve an easement is unpersuasive especially where, as here, the language references a recorded Plan on which the right-of-way is clearly

depicted. Contrary to the arguments of the Nicolases, on the facts of this case, use of the phrase "subject to" is not intended to merely constitute a limitation on a grantor's warranties.

Likewise, it is of no consequence that according to the Deed, the Allens were "relinquishing and conveying all right by descent and all other rights" in Lot 4. This standard language, read in the context of the entire deed, does not cloud or make ambiguous the Allens' intent when conveying the property. The Court understands the Deed's language to convey the Allen's ownership interest in Lot 4, while reserving an easement for the benefit of their other parcels.

Finally, Defendants argue the Allen to Schaub Deed identifies the "beneficiary" of the Disputed Way as the "owners of Lots 1 and 2" rather than the "Grantors" or "Allens", and for this reason there lacks clear intent for the Allens to reserve any rights as grantors. Defendants are correct that under Maine law, an easement appurtenant must be attached to or related to the dominant estate of the grantor, and thus cannot be reserved for the benefit of a third party. Nevertheless, at the time Lot 4 was conveyed to the Schaubs, the Allens retained ownership of the remainder of their land. Thus, the Allens were not attempting to reserve rights for the benefit of a third party, they were reserving rights for themselves via their ownership of the land designated as Lots 1 and 2 on the Plan.[1] It follows, therefore, that the Court GRANTS Plaintiffs' Motion for Partial Summary Judgment on Count I of their complaint. The Allen to Schaub Deed unambiguously reserves a twenty foot wide easement appurtenant for vehicular and foot traffic across the Nicolases' property (Lot 4). Conversely, the Court DENIES the Nicolases' Motion for Partial Summary Judgment on Count I of their Counterclaim.

[1] For purposes of the easement analysis, the fact that Lot 4 was conveyed before Lots 1 and 2 is not significant. The Allens still owned the land that would constitute Lots 1 and 2, and Lots 1 and 2 (and the 20 ft right-of-way) were all clearly shown on the recorded Plan at the time Lot 4 was conveyed.

7

**II. The Fullertons Have Easement Rights over the Nicolases' Property to use the Walking ROW to Access Merriconeag Sound**

Maine law recognizes two types of easement: easements in gross and easements appurtenant. *Stickney,* 2001 ME 69, ¶ 31, 770 A.2d 592. Easements in gross are personal interests in land or the right to use another's land. *Id*. Thus, an easement in gross is only for the use of a specific grantee. *See Id.* Meanwhile, an easement appurtenant is created to benefit a "dominant tenement" and is attached to or related to the estate of the grantor, running with the land. *O'Donovan v. McIntosh,* 1999 ME 71, ¶ 7, 728 A.2d 681. Maine courts seek, whenever possible, to construe easements as appurtenant. *Stickney*, 2001 ME 69, ¶ 33, 770 A.2d 592.

Plaintiffs assert that Lots 5 and 6 have express deeded easement rights over the Nicolases' property (lot 4) to use the Walking ROW to access Merriconeag Sound. According to the "Walking Right of Way/Easement Deed", the Favreaus granted the Allen Trustees a "perpetual walking right-of-way/easement" across their property (Lot 4). Exhibit A to the Deed describes the ROW as follows:

> A twenty (20) foot wide walking right-of-way/easement running along the southwesterly boundary line of Lot 4 (owned by the Grantors-Favreau) as shown on Plan of Abner's Point Lots on Baily Island, Harpswell, Maine for Bruce Allen dated August, 1979 and recorded in the Cumberland Country Registry of Deeds in Plan Book 124 at Page 60. Said walking right-of-way/easement is located in the area on said plan delineated as "20' R/W" and runs from the northwest corner of Lot 5 on said plan to Merriconeag Sound. Said walking right-of-way/easement benefits all lots on said plan.

(Pl.'s Ex. S). In 2018, the Favreaus conveyed Lot 4 to the Nicholas'. Stip. SMF ¶ 20.

In opposition to Plaintiffs' assertion, the Nicolases argue the walking ROW/easement detailed in the deed is merely an easement in gross. Such an easement would have been for the benefit of the Allen Trustees alone and would not run with Lots 5 and 6 when sold. In support of their argument, the Nicolases point to the personal nature of the language in the deed, and assert

8

that because the grantees to the Walking Right-of-Way/Easement Deed were identified by name alone, the easement was not intended to benefit a dominant estate. Further, the Nicolases contend nothing in the deed identifies that the easement was being given by virtue of the ownership of the benefited land. The Nicolases' arguments ignore the plain language of the deed and the Plan and thus fail to persuade the Court.

As previously stated, when interpreting a deed and assessing easement rights, courts will look to the plain language within the four corners of the deed, aiming to enforce the intent of the parties as contained therein. When granting an easement over their property, the Favreaus explicitly described the ROW as "perpetual", a word defined as "lasting for eternity: never ending." *Perpetual,* Webster's II: New College Dictionary (2001). The right-of-way leads from the northwest corner of Lot 5, across Lot 4 to Merriconeag Sound, and is referenced on the Plan of Abner's Point Lots on Baily Island. The Plan as referenced is to be interpreted alongside the deed, which further states that the "walking right-of-way/easement benefits all lots on said plan." The Walking ROW/Easement Deed is not ambiguous; its plain language granted a perpetual walking right-of-way to the Allen Trustees as owners, for the benefit of all lots on the referenced Plan. The easement at issue was expressly granted to the Allen Trustees to benefit the land they owned. As such, the walking right-of-way is an easement appurtenant that runs with the land and provides Plaintiffs with the rights contained therein. Accordingly, the Court GRANTS Plaintiffs' Motion for Partial Summary Judgment on Count III of their Complaint. Necessarily, the Court DENIES the Nicolases' Motion for Partial Summary Judgment on Count IV of their Counterclaim.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Partial Summary Judgment is GRANTED. Judgment in favor of Plaintiffs is entered on Counts I and III of their Complaint, and

9

on Counts I and IV of Defendants' Counterclaim.  Conversely, the Court DENIES Defendants' counter Motion for Partial Summary Judgment.

The Clerk is requested to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Dated:_April 23, 2020_____                         _____/s_____
                                                   Michael A. Duddy
                                                   Judge, Business and Consumer Court

**Kinderhaus North, LLC**
**Prime Properties ME, LLC**
**Karen and Brian Fullerton**


**v.**

Karl and Stephanie Nicolas
**H. Allen and Dianne Ryan (Parties in Interest)**



**Kinderhaus North, LLC**
**Prime Properties ME, LLC**
**Karen and Brian Fullerton**        Christopher Pazar, Esq.
        Drummond & Drummond
        One Monument Way
        Portland, ME 04101
        Brendan O'Rourke, Esq.
        Thompson, Bowie & Hatch
        PO Box 4630
        415 Congress Street, 5th Floor
        Portland, ME 04112-4630
        David Soley, Esq.
        Bernstein, Shur, Sawyer & Nelson
        PO Box 9729
        100 Middle Street
        Portland, ME 04104-5029



Karl and Stephanie Nicolas
**H. Allen and Dianne Ryan**        Keith Glidden, Esq.
        Verrill Dana, LLP
        One Federal Street, 20th Floor
        Boston, MA 02108-4407
        Jason Dionne, Esq.
        Isaacson & Raymond, PA
        PO Box 891
        Lewiston, ME 04248

**H. Allen and Dianne Ryan**        David Jones, Esq.
        Jensen, Baird, Gardner, Henry
        11 Main Street, Sute 4
        Kenebunk, ME 04043